ARTHUR LEWIS, administrator, *vs.* LYNN INSTITUTION
FOR SAVINGS.

Essex.   November 10, 1888. — January 2, 1889.

Present: MORTON, C. J., FIELD, DEVENS, C. ALLEN, & KNOWLTON, JJ.

*Savings Bank — Apportionment of Losses among Depositors — Payment.*

The promise of a savings bank to its depositors is to combine and manage their deposits according to the best judgment of its trustees, and to share among them proportionately the beneficial results, if any, of such management, and not to repay the full amount of their deposits at all events.

If a loss occurs in the assets of a savings bank which prevents the payment of its deposits in full, and a just deduction is made from each to apportion the loss, in accordance with a vote of the trustees, and the balance then remaining of a

deposit is paid to a depositor, he knowing the facts and accepting the same with-
out complaint, such payment is a settlement of the claim of the depositor, and
debars him from recovering the amount of such deduction.

CONTRACT, by the administrator of the estate of Mary Lewis,
to recover the balance of a deposit made by her with the defend-
ant.  At the trial in the Superior Court, before *Lathrop*, J., the
facts appeared in evidence, or were agreed, as follows :

The defendant was a savings bank duly chartered by the laws
of the Commonwealth, and authorized to receive deposits and
invest the same.  In the years 1836 and 1837, while the plain-
tiff's intestate was a depositor with the defendant, it met with
losses in investments made in stock of the Nahant Bank and
the Oriental Bank, which investments were made in good faith
and duly authorized, amounting to five per cent of its deposits,
and thereupon the trustees of the defendant passed the follow-
ing votes: " May 18, 1838.  Voted, that the treasurer be di-
rected to charge those who were depositors on the 19th of the
11th month, 1836, with three per cent on the amount of their
deposits, to cover the loss sustained by the failure of the Nahant
Bank " ; and " Voted, that the treasurer be directed to charge
those who were depositors on the 18th day of the 10th month,
1837, with two per cent on the amount of their deposits, to
cover the loss sustained by the depreciation of the Oriental
Bank."

The books of the defendant bank showed that, immediately
after the passage of the votes above set forth, its treasurer
charged to every depositor three per cent and two per cent re-
spectively, under these votes, on the amount of each deposit.

The plaintiff offered in evidence a deposit-book, numbered 32,
issued by the defendant to the plaintiff's intestate, which con-
tained the following statements :

" The object of this institution is to afford every industrious
person the great advantage of public security and interest for
small sums of money, and to enable them, without much ex-
pense of time or trouble, to obtain that personal comfort and
independence which arises from prudent conduct.  Sums are
received by this institution so low as one dollar at a time, and
laid out in government or bank stocks, or other unquestionable
securities.  For the improvement of this money, the depositor

will be paid five per cent per annum, or two and a half per cent half-yearly, payable in the months of April and October. The surplus interest over and above the five per cent thus divided will be divided among the depositors every five years, after deducting therefrom the necessary expenses of the institution, which, it is presumed, will be very small, as the trustees and other officers will superintend the business of it without the smallest benefit to themselves. The money placed in this institution may be taken out on the third Wednesday of every month, if required by the depositors; or they may (by will or transfer) give the whole to any of their relations or other persons. The subjoined table shows how much a weekly saving of different small sums produces in several periods of time; an advantage never before within the reach of the frugal, industrious, and provident. [Here followed a "table showing the produce of weekly savings at a compound interest of five per cent, as allowed by this institution."] In addition to the interest above calculated, which is certain, there will be every fifth year a dividend, or payment to each person whose money shall have remained there during five years, of probably not less than five per cent on the amount, or five dollars on every hundred."

This deposit-book contained the following by-laws, which alone are material:

Article 1. "Object of the Institution. To provide a safe and profitable mode of enabling industrious persons of all descriptions to invest such parts of their earnings or property as they can conveniently spare, in a manner which will afford them profit and security."

Article 9. "Duties of Trustees. Two of the trustees shall attend in rotation at the office every Wednesday during office hours, any one of whom shall direct the investment of the moneys which may be deposited, subject to the provisions contained in the 7th article; and they pledge themselves to the public for the faithful and upright execution of this part of their trust."

Article 10. "Dividends. On the third Wednesday in April and October, in every year, there shall be declared a dividend of two and a half per centum, or five per centum per annum, on

all sums which shall have remained on deposit for the space of six months next preceding, and one and a quarter per centum on all sums which shall have remained for the space of three months next preceding, which dividend shall be payable on the fourth Wednesday of April and October, or at any other time during office hours previous to the third Wednesday in July or January following, at which time all dividends not called for shall be added to the principal of the depositor, and be placed on interest from the time of declaring the dividend."

Article 12. "Extra Dividends. There shall be declared and paid on the third Wednesday of October, 1831, an extra dividend of all the profits which may have accrued during the preceding year, (after deducting the dividends already made, the necessary expenses of the institution, and the sum necessary to keep good the capital stock,) to and among all such depositors whose deposits exceed the sum of five dollars, and which shall have remained in said institution during the year next preceding the time of declaring and paying said dividend; and the trustees may make afterwards such extra dividends, to be declared and paid on the third Wednesday of October, whenever they may think proper, it being understood that they are to be made at least once in five years, and that they are to divide at each extra dividend all the profits (deducting as aforesaid) among such depositors whose deposits exceed the sum of five dollars, and which shall have remained in said institution for the space of one year at least next preceding the time of declaring said extra dividend, in proportion to the sum by them respectively deposited, and to the length of time which the said deposits may have remained in said institution; but in making said apportionment, no regard shall be had to any fractional parts of a year, but each sum deposited within every year shall be referred, for the purpose of calculating its share of the extra dividend, to the third Wednesday of October next following the time at which it was deposited."

Article 13. "Mode of withdrawing Funds and receiving Interest. Dividends may be received either personally, or by the order in writing of the depositors, or by letter of attorney. Money deposited shall only be drawn out by the depositor, or by some person by him legally authorized; but no person shall

receive any part of his principal or interest without producing the original book, that such payment may be entered therein, except in cases where the original deposit-books are lost, in which cases, after the depositor whose original deposit-book is lost shall have advertised the said book as lost, in the newspaper printed in Lynn or Salem, for such term of time, not less than three months, as the standing committee for the time being shall require, in which advertisement the number of his said deposit-book, the amount of each of his deposits entered therein, the name of the same depositor, and his intention to apply to the institution for the payment of his deposits and interest, notwithstanding the loss of his original deposit-book, shall be particularly stated; or after he shall have given satisfactory security to the same committee that he will refund to the institution all money which shall be paid him by the institution on account of his said deposits, and of the interest thereon, provided his said deposit-book shall be afterwards found or produced; the same depositor, notwithstanding the loss of his original deposit-book, shall be entitled to receive from the treasurer the amount of his deposits entered in the book so lost, and the interest which has accrued thereon. No money can be withdrawn except on the third Wednesday of each month; and no sum less than five dollars of the capital of any depositor shall be withdrawn unless the whole sum deposited by such person shall be less than that amount."

Article 14. "Duplicate Book. All deposits shall be entered in the books of the corporation, and a duplicate book shall be given to each depositor, in which the sum paid by him shall be entered, and which shall be his voucher, and the evidence of his property in said institution."

Article 16. "No Emoluments. The trustees of this institution shall never receive any emolument therefrom, but may allow reasonable compensation to a treasurer, or such other officers as may be found necessary."

Article 19. "Institution how dissolved. The trustees may, by a vote of a major part of the whole number, at any time return the amount of all or any of the deposits, or divide the whole of the property among the depositors, in proportion to their respective interests therein, upon giving three months'

notice thereof, and shall also be at liberty to refuse to receive any deposits at their pleasure."

Article 20. " Trustees free from Responsibility. The trustees, undertaking these duties without the expectation of emolument, and pledging themselves to an upright and conscientious discharge of them, are not to be held responsible for any losses which may happen, from whatsoever cause, except their wilfully corrupt misconduct; in which case those trustees only who were present and guilty of such misconduct shall be answerable for the same."

Article 21. " The trustees have proposed the payment of five per cent as the stated interest merely as an experiment, and have provided that the depositors shall receive, by way of extra dividends, all the surplus profits above the five per cent annually divided; they moreover pledge themselves that the annual rate of interest shall be raised as soon and as high as experience shall prove to be practicable."

The account between the defendant and the intestate, con﹔ tained in the deposit-book, disclosed as due to her, under the date of April 18, 1838, the sum of three hundred and twenty-one dollars and sixty cents, followed by this entry under the year 1838, " May 21, Paid three hundred and six and 35-100," leaving an apparent balance of fifteen dollars and twenty-five cents, the figures representing which were the last entered in the deposit-book, and which was the sum by which the deposit of the plaintiff's intestate would be reduced if made under the terms of the two votes of the defendant's trustees of May 18, 1838.

The defendant introduced in evidence its ledger account with the plaintiff's intestate, the material part of said account being as follows:

| " 1838. | | $321.60 |
|---|---|---|
| | Loss deducted, | 15.25 |
| May 21, | Paid | 306.35 " |

The ledger of the defendant bank showed that under the figures " 306.35," above mentioned, were drawn two red lines, which were explained in evidence to indicate that the account was closed.

This payment of three hundred and six dollars and thirty-five cents was made to an attorney at law, who acted for the intestate, and signed a receipt for the money on the books of the bank; and also, on the same day, signed similar receipts on behalf of two other persons, whose deposit-books show a similar unpaid balance.   Mary Lewis died in 1855, and administration on her estate was taken out for the first time in 1886.   From the time of the payment to her attorney there was no evidence of a demand for the money in suit during her life; and the pass-book above referred to was found in a bureau drawer in a room in the house in which she lived and died, which room was used by her as a room in which to store things that were not in use.   In the same bureau were found, at the time the pass-book in question was discovered, some old account-books, old deeds, silk handkerchiefs, old tortoise-shell combs, and " old-time fans."

Upon these facts the court ordered the jury to return a verdict for the defendant, on the ground that the trustees had the right to apportion the losses in the manner above set forth; and reported the case for the determination of this court, such disposition of the case to be made as law and justice might require.

*J. R. Baldwin*, for the plaintiff.

*H. P. Moulton*, (*J. F. Hannan* with him,) for the defendant.

C. ALLEN, J.   This case is certainly quite remarkable in its facts.   More than fifty years ago the defendant savings bank closed upon the books the account of a female depositor, by paying to her attorney the balance found to be due after making a deduction of five per cent for losses sustained on its investments; and the present action is brought by the administrator of her estate to recover the amount so deducted, with interest. The case calls upon us to look into the nature of the contract made by the savings bank with the depositors, under the system which then existed, and which has always prevailed in Massachusetts since savings banks began.   And in determining what the contract was, regard must be paid not merely to the language used by the defendant in the books which it issued to its depositors, but to the circumstances under which the deposit was received, and the chartered powers and purposes of the institution itself.

The Lynn Institution for Savings was incorporated by the St. of 1826, c. 20. Twenty-eight persons were named in the act, who, with such others as might be duly elected members, were made a corporation, with power to receive deposits, to be used and improved to the best advantage, and the income or profit thereof to be applied and divided among those making the deposits, and their executors, administrators, or assigns, in just proportion; the principal to be withdrawn at such times and in such manner as the corporation should direct and appoint; other persons might be elected members; a president and other necessary officers might be chosen; and by-laws might be made. It was also provided that the officers should lay a statement of its affairs before any persons appointed by the Legislature to examine the same, whenever required to do so, and that the Legislature might at any time make further regulations for the government of the institution, and alter, amend, or repeal the act of incorporation at pleasure.

At the time of granting this charter there were no general laws in Massachusetts respecting savings banks, and but five earlier charters had been granted, viz.: by the St. of 1816, c. 92, to the Provident Institution for Savings in Boston; by the St. of 1818, c. 64, to the Institution for Savings in Salem; by the St. of 1819, c. 85, to the Institution for Savings in Newburyport; by the St. of 1824, c. 95, to the Institution for Savings in Roxbury; and by the St. of 1825, c. 4, to the New Bedford Institution for Savings. The last one alone of the earlier charters contained similar provisions to that of the defendant, reserving the right of alteration, amendment, or repeal.

The first general legislation concerning savings banks was the St. of 1834, c. 190, which was incorporated, with some additions, into the Rev. Sts. c. 36, §§ 71–84. This legislation provided that every such corporation might receive on deposit, for the use and benefit of the depositors, all sums of money offered for that purpose, to a limited amount; prescribed the manner of investing the deposits; required that the income or profits of all deposits should be divided among the depositors, or their legal representatives, in just proportions, with a deduction of all reasonable expenses incurred in the management thereof; and provided that the principal deposits might be withdrawn

at such time or in such manner as the corporation should in its by-laws direct. In the Revised Statutes provision was also made for an annual return to the Secretary of the Commonwealth, by each institution, showing its condition. By the St. of 1851, c. 127, a board of bank commissioners was established, with power, amongst other things, to visit and examine savings banks, and in case of need to apply to this court for an injunction, and for receivers, temporary or permanent.

It thus appears that a savings bank is an incorporated agency for receiving the moneys of depositors in small or moderate amounts, and investing them merely for the use and benefit of the depositors, who are to receive the advantage thereof in just proportion. At the outset, the chief purpose was to encourage frugality by affording to persons of small means an opportunity to have their savings cared for by persons of experience, who, by combining the deposits, could make advantageous investments not available for small investors. And this purpose still exists. The corporation had no capital stock, properly so called. There was no relation of privity between successive depositors, as there is between successive stockholders in an ordinary corporation. No profit or benefit accrued to the managers. It is a matter of familiar knowledge, that in the earlier times the officers of savings banks, with the exception of the treasurer, usually received no pay for their services. It was so with the defendant. The savings-bank book, upon which the deposit now sought to be recovered is shown, states that the savings bank would be open every Wednesday from two to three o'clock P. M., and that the trustees and other officers would superintend the business without the smallest benefit to themselves; and one of the by-laws provides that the trustees shall never receive any emolument, but may allow a reasonable compensation to a treasurer, or such other officers as may be found necessary.

Gradually, with the progress of time, a practice grew up among savings banks, which is now made compulsory by the Pub. Sts. c. 116, § 24, of reserving a guaranty fund to meet possible losses; but the fundamental idea has never been departed from, that all the funds and investments of a savings bank are held exclusively for the benefit and security of the depositors. This idea was, and still is, the corner stone of the

whole system.  There is no corporation, with any purpose or possibility of profit to itself, independently of the depositors ; but the latter are to share whatever profit may be made in just proportion among themselves.  The corporation is a mere agency for managing the moneys of the depositors.

To others, to third persons, the corporation can incur liabilities, in contract or in tort, for which the funds in its hands will be responsible.  But to the depositors themselves, the undertaking of the corporation is that it will receive and combine the deposits, and manage and use them to the best practicable advantage, according to the judgment of the trustees, and give to the depositors in just proportion among themselves the benefit of the result of such management.  There is no absolute promise to repay to any depositor the full amount of his deposit, at all events.  Such a promise to one depositor would imply that in case of loss he should be repaid out of the deposits of others.  But the promise or undertaking of the corporation is the same to all.  There is no promise to pay one at the expense of others.  The promise is, in effect, to pay each depositor in full, with his dividends, provided the assets are sufficient ; and if they are not sufficient, then to pay to each one his proportionate share.

There is no legal difficulty ordinarily in maintaining an action against a savings bank to recover a deposit, because ordinarily the assets are sufficient, and the savings bank when sued has no occasion to insist on the condition.  It admits that its funds are sufficient, and the plaintiff's right in other respects is all that has to be considered.  But suppose a great loss has occurred, by fire, theft, defalcation, or otherwise, and the assets are reduced so that the savings bank can only pay fifty or seventy-five per cent, and the case becomes different.  At present, the most convenient method under such a disaster is to seek the appointment of a receiver.  But it is not conceived that this is a necessary mode of procedure, provided the officers and the depositors can agree upon a settlement between themselves.

In the present case, there was a loss, from investments lawfully and properly made in the shares of two banks ; and the officers of the defendant estimated the loss at five per cent, and passed votes that the depositors would have to submit to a deduction of that percentage upon their deposits.  If the depositors

were dissatisfied, it was open to them to make objection in some legal form. But they did not do so. They appear to have been satisfied with, or at least to have submitted to, the course of the trustees. And if the plaintiff's intestate, or her duly authorized attorney, accepted the balance found due, after making the deduction, as and for a settlement and payment of what she was entitled to receive upon her deposit, such acceptance, in the absence of fraud, would bind her. It would be like any settlement between principal and agent, where the agent accounts for and delivers up all the property of the principal which he has, and the principal receives it. In the present case it has been argued that a broader contract is to be found in the statements of the savings bank, contained in its book issued to the plaintiff's intestate, of what it will pay, and also in its by-laws. But these statements, when looked at in view of the nature and character of the institution, are not to be taken as promises, but rather as statements of the expectation of the managers in respect to the success of their management. These statements in the book before us are pretty broad, to be sure; but after all, taking the whole of the by-laws together, it sufficiently appears that the depositors were to stand on a basis of equality; and though profits are all that are spoken of in terms, by intendment of law losses must be shared in like proportion.

The views above expressed are supported to a greater or less extent by the decisions in the following cases. *Cogswell* v. *Rockingham Ten Cents Savings Bank*, 59 N. H. 43. *Hall* v. *Paris*, 59 N. H. 71. *Simpson* v. *City Savings Bank*, 56 N. H. 466. *Bunnell* v. *Collinsville Savings Society*, 38 Conn. 203. *Osborn* v. *Byrne*, 43 Conn. 155. *In re Newark Savings Institution*, 1 Stew. (N. J.) 552. See also *Huntington* v. *Savings Bank*, 96 U. S. 388. They are opposed to the decision in *Makin* v. *Savings Institution*, 23 Maine, 350, with which we are unable to agree. The remark in *Reed* v. *Home Savings Bank*, 130 Mass. 443, 446, that a depositor in a savings bank becomes a creditor of that bank, is correct; but there was then no occasion to consider what is now determined, namely, that the promise of the savings bank is not an absolute promise to pay in full at all events.

It is further contended by the plaintiff, that it does not appear that the plaintiff's intestate or her attorney accepted the sum

paid by the defendant in 1838 as a full settlement of what she was entitled to receive. But after this lapse of time some things are to be taken for granted. On May 18, 1838, the trustees passed the votes directing the treasurer to charge off three per cent to cover the loss sustained by the failure of the Nahant Bank, and two per cent to cover the loss sustained by the depreciation of the Oriental Bank, and these sums were immediately charged against every depositor. The sum by which the deposit of the plaintiff's intestate would be reduced by these two votes was $15.25. That sum was charged against her on the defendant's ledger, "for loss deducted," leaving a balance due to her of $306.25, which was marked as paid on May 21, and two red lines were drawn underneath the figures, indicating that the account was closed. The payment of that sum was made on May 21, 1838, three days after the votes above mentioned, to an attorney at law, who acted for her and others, and who signed a receipt for the money on the books of the bank, and on the same day also signed similar receipts for two other persons. The plaintiff's intestate died in 1855. The savings-bank book was retained by her, with the payment of $306.25 indorsed thereon, showing a balance of $15.25 unexplained on the book.

The plaintiff made no explicit request to have the question submitted to the jury, whether Mrs. Lewis or her attorney received the payment on May 21, 1838, knowing that the trustees had voted to make the deduction from the deposits ; and the ruling of the court was upon the ground that the trustees had the right thus to apportion the losses. It is now to be assumed that the apportionment was a just one, that notice thereof was given to the depositors, and that it was known to the plaintiff's intestate or her attorney when the money was paid. The court will not readily infer or assume the existence of a wrong which has not been discovered or complained of for fifty years. This being so, the payment was a settlement, and the plaintiff's intestate received all that she was in law entitled to receive.

*Judgment for the defendant.*