# THE PEOPLE OF THE STATE OF NEW YORK, PLAINTIFF, *v.* THE ULSTER COUNTY SAVINGS INSTITUTION, DEFENDANT.

## IN THE MATTER, OF LEWIS A. MITCHELL, APPELLANT.

*Savings bank — application for its dissolution and a receiver — when the bank will be allowed to resume on scaling down the deposits — power of the court.*

A savings bank, incorporated under a special act (chap. 152, Laws of 1851), was successful in its business until September 17, 1891, when a defalcation upon the part of its treasurer and assistant treasurer was discovered. An examination by the superintendent of the banking department, made November 1, 1891, showed its liabilities to be $2,474,465.89, and its assets to be $2,108,547.39, showing a deficiency of less than fifteen per cent of its liabilities.

Section 278 of chapter 409, Laws of 1882, the act relative to savings banks, provides, among other things, that whenever it shall appear to the said superintendent that an officer of such a bank has been guilty of misconduct or malversation the superintendent shall communicate the facts to the attorney-general, who shall institute such proceedings as the nature of the case may require. Said section also provides that "the court before which such proceedings shall be instituted shall have power to grant such orders, and in its discretion, from time to time, to modify or revoke the same, and to grant such relief and render such judgment as the facts or evidence in the case, and the situation of the parties and the interests involved, shall seem to require."

Upon a communication received by him from the superintendent of the banking department the attorney general began proceedings to dissolve the bank and to have a receiver appointed, and a temporary receiver was appointed.

Thereafter the bank, upon a petition signed by all the trustees of the bank, by the receiver and by depositors representing $900,000, applied for permission to resume business as a solvent institution upon a basis of eighty-five per cent of its liabilities; in other words, that each deposit be reduced fifteen per cent.

*Held,* that it has been the policy of the State to allow, whenever it was practicable, institutions of this character to resume business upon a basis of solvency.

That, under the provisions of section 278, above cited, the court was authorized to permit the bank to resume its business upon scaling the deposits down to a point which would render the bank solvent.

The nature and functions of a savings bank, and the manner in which it differs from a discount bank, considered.

Instances of similar action by the courts of other States.

APPEAL by Lewis A. Mitchell from an order made at a Special Term of the Supreme Court, held in Rensselaer county March 12,

1892, denying a motion to vacate certain orders staying the commencement of actions against the defendant, made on the return day of an order to show cause. The above-entitled action was brought by the attorney general under the provisions of section 278 of chapter 409 of the Laws of 1882, providing as follows:

"§ 278. Whenever it shall appear to the superintendent, from any examination made by him, or from the report of any examination made to him, or from the report made by any such corporation pursuant to the requirements of section 270 of this act, that any such corporation has committed any violation of its charter or of law, or is conducting its business and affairs in an unsafe or unauthorized manner, he shall, by an order under his hand and seal, direct the discontinuance of such illegal and unsafe or unauthorized practices, and strict conformity with the requirements of the law, and with safety and security in its transactions; and whenever any such corporation shall refuse or neglect to make any such report as is hereinbefore required, or to comply with any such order as aforesaid, or whenever it shall appear to the superintendent that it is unsafe or inexpedient for any such corporation to continue to transact business, or that any trustee or officer of a savings bank has abused his trust or been guilty of misconduct or malversation in his official position injurious to the bank or to its depositors, he shall communicate the facts to the attorney-general, who shall thereupon institute such proceedings as the nature of the case may require. The proceedings instituted by the attorney-general may be for the removal of one or more of the trustees, or for the transfer of the corporate powers to other persons, or the consolidation and merger of the corporation with any other savings corporation that may be willing to accept of the trust, or for such other or further relief or correction as the particular facts communicated to him shall seem to require. And the court before which such proceedings shall be instituted shall have power to grant such orders, and in its discretion, from time to time, to modify or revoke the same, and to grant such relief and render such judgment as the facts or evidence in the case, and the situation of the parties and the interests involved shall seem to require; and whenever in such proceedings, an order shall be granted upon notice, or without notice, restraining such corporation and its officers from paying out or dis-

posing of any moneys or property of or held by such corporation, the superintendent may, and if directed by the court shall, take temporary possession of all the assets, property and rights of or held by such corporation, and hold such possession until the further order of the court. If a receiver be appointed he shall, subject to the direction of the court, proceed with diligence to convert the assets of the bank into money, and to make distribution thereof. And every receiver of a savings bank shall, whenever required by the court, upon the application of the attorney-general, render an account of his proceedings, and shall render a full account of all his proceedings, and make final distribution within eighteen months from the time of his appointment, unless the court, upon application by the receiver and notice to the attorney-general, shall give additional time for that purpose. The court may make such orders for the payment of small deposits by receivers, or such other provisions in respect to such deposits, to facilitate the distribution of the assets as may be just. Every official report made by the superintendent to the attorney-general, and every official report duly verified of any examination made under the provisions of this act, shall be presumptive evidence in all preliminary legal proceedings on motion to appoint a receiver."

*Simpson & Werner*, for the appellant.

*Kenyon & Sharpe* and *A. Schoonmaker*, for the defendant.

*I. H. Maynard*, Deputy Attorney-General, for the plaintiff.

*C. M. Preston*, Bank Superintendent, in person.

*John E. Van Etten*, for certain depositors.

*Linson & Van Buren*, for the receiver.

The following opinion was delivered at Special Term:

FURSMAN, J.:

The defendant was incorporated as a savings institution by act of the legislature, passed April 12, 1851. (Laws of 1851, chap. 152.)

It has accumulated up to the commencement of this action deposits to an amount exceeding two millions of dollars. Its business affairs

have been managed by thirteen trustees, except that by death and resignations the number at this time is reduced to eleven. The treasurer and assistant treasurer were appointed in 1867, and have held their respective offices continuously from that time down to the time of their removal in September and October last, respectively. About the 17th of September, 1891, a defalcation, resulting from the misappropriation and abstraction of its funds on the part of the treasurer and assistant treasurer, was discovered. Thereupon, at the instance of the trustees, the superintendent of the banking department began an official examination of the affairs of the bank, and afterwards the bank was closed and a report of its condition made to the attorney-general pursuant to statute. Afterwards this action was commenced by the attorney-general for the dissolution of the bank and the appointment of a receiver, and such proceedings were had that a temporary receiver was appointed, who duly qualified and entered upon the discharge of his duties. A careful and accurate examination of the affairs of the bank by the superintendent disclosed that on the first day of November last its liabilities were $2,474,465.89, and its assets $2,108,547.39, thus leaving a deficiency of $365,918.50. This deficiency is less than fifteen per cent of the liabilities of the bank, and it is now claimed and insisted that the bank can resume business as a solvent institution upon a basis of eighty-five per cent of its liabilities, and application is made to this court for permission to do so.

This application is made upon petitions on the part of all the trustees of the bank, and of the receiver, and by depositors representing upwards of $900,000 of deposits.

The petitions show that the total number of depositors is in the neighborhood of 6,000, and that of those who are not petitioners a large number of depositors, representing small amounts, are widely scattered over Ulster county, some reside in other counties, and also in other States, and that deposits to the amount of upwards of $150,000 are represented by persons whose residence and address cannot be ascertained. The petitions also show that, so far as can be learned, it is the universal desire of the depositors that the business of the bank shall be resumed, and it is asserted by counsel, and remains undisputed, that no depositor has expressed any unwillingness.

A careful study of the situation, as presented by the petitions, by the official certificate of the superintendent of the banking department, and by the various arguments and suggestions of counsel, induces in my mind the belief that such a course will be beneficial to all parties in case it is found that there is power in the court to authorize it. Such a course will continue in existence a long-established and hitherto useful institution, which has only now been impaired by the extraordinary misconduct of its treasurer and assistant treasurer. It will save to depositors a large amount of their funds, which must necessarily be consumed in expenses in case the action proceeds, or the bank is put in liquidation and its assets distributed ratably among its creditors; it will save, moreover, to a large number of persons who are debtors to the institution the loss that cannot be avoided from shrinkage in values, resulting from forced collections of mortgages, and will probably result in assisting to sustain generally the credit of business men who have at this time deposits in the bank.

It has been the policy of this State for a long series of years to permit savings institutions, whose assets from any cause have shrunk below their liabilities, to resume business wherever it could be done upon a solvent basis, and this course has been uniformly, so far as I have been able to ascertain, recommended by the banking department. In 1879 this course was taken by Bank Superintendent Henry L. Lamb in the case of the Oswego City Savings Bank, and the Supreme Court permitted that institution, under like circumstances, to scale down its liabilities to depositors ten per cent, and thereupon to resume business. Since that time the bank has been prosperous, and its deposits have steadily increased. In 1883 Bank Superintendent A. B. Hepburn, in his annual report to the legislature, approved the policy thus pursued by Superintendent Lamb. In that report he says : " No one can make a study of the failed savings banks without perceiving how much better it would have been for depositors in many instances had the deposits been scaled so as to render the bank solvent, and they have been allowed to continue business. This department and the courts now have by law sufficient power over the tenure of office of savings bank managers to secure the removal of incompetent or unfaithful men. With the funds still in the hands of trustees, under the direction of the court

and subject to the supervision of the superintendent, the depositors would have realized much more money, and the expensive management and costly and interminable litigation which succeeds insolvency, as the night the day, would have been avoided. It seems that our courts now have the power to reduce each individual deposit to an amount sufficient to render an insolvent savings bank solvent, and authorize the managers of the bank to charge against each separate depositor such amount."

Referring to the Oswego City Savings Bank, he adds: " The eminent success attending the scaling process in the only instance in which it has been tried in this State is a strong, practical argument in favor of providing by statute for carrying out what seems to be a law already."

In 1885 Superintendent Willis S. Paine expressed his approval to the legislature as follows: " In the single instance in the history of the savings banks of this State in which the scaling process has been resorted to as a possible means of saving depositors from ultimate loss, the experiment has met with such marked success it is probable that in the future this remedy will be applied in preference to placing the affairs of temporarily embarrassed banks in the hands of receivers for liquidation."

It will thus be seen that the opinion of those most familiar with the savings banks of the State, and whose duty it has been to exercise a supervision over their affairs, so far as the same has been expressed, indicates the propriety of permitting savings institutions to resume business wherever it can be done upon a solvent basis.

The remaining question is one of power. The statute, which authorizes the institution of actions like the present, provides that " the court before which such proceedings shall be instituted shall have power to grant such orders, and in its discretion, from time to time, to modify or revoke the same, and to grant such relief and render such judgment as the facts or evidence in the case and the situation of the parties and the interests involved shall seem to require." (R. S. [8th ed.], p. 1573, § 278.)

The power thus conferred seems to be sufficient to enable the court to make such orders and such disposition of the institution and its affairs as may appear to be for the best interests of the institution, its creditors and depositors. Savings banks are quite unlike

ordinary banks. Commonly, banks are business corporations, have stock and stockholders and paid officers, and conduct their affairs with a view to profit. Their relation to their depositors is in no sense one of trust. They receive deposits to be paid upon the check or draft of the depositors without interest or addition. Their profits, if any, are distributed among their stockholders, and its losses fall upon them, and their property is subject to sequestration at the suit of any creditor. A savings bank is an institution of quite a different character. Its relation to its depositors is in a large sense one of trust and confidence. It has no stock and no stockholders. Its depositors are not entitled to draw checks against it. It does not receive deposits to be paid upon demand simply, but for investment on securities taken for the benefit of the depositors. Its assets are held for distribution among its depositors ratably, and its losses fall in like manner upon its depositors, and no creditor or depositor can, by diligence in the pursuit of any legal remedy, obtain any advantage over any other creditor or depositor. Its profits and its losses fall upon each depositor according to his just proportion, and no depositor has a right in the distribution of its assets to obtain or receive his deposit in full at the expense of the other depositors. The assets, after deducting the necessary expenses, are held simply as belonging to and as security for all the deposits. It would seem, therefore, that no depositor has any just cause of complaint, if he is not permitted to receive his deposit in full, in case the assets are insufficient to pay all the depositors in full. Nor would the trustees be justified in exhausting or even impairing the assets of the institution in payment in full of diligent depositors, and thereby leaving those who are less vigilant to receive a less sum than would be theirs if a just and ratable distribution were had. Under the circumstances, the assets of the bank being held for all the depositors and the losses sustained by all, and there being no right in any depositor to insist upon the payment of his own claim in full at the expense of others, it is clear that the loss already sustained may and should thus be distributed, and the bank, if possible, permitted to resume business for the benefit of all depositors alike, that in the end each depositor may receive as much as possible.

In the case of *The People* v. *The Mechanics and Traders' Savings Institution* (92 N. Y., 7), the action was brought by a creditor (other

than a depositor) to compel the receiver to pay certain judgments in favor of one Sistare, and it was substantially held that all creditors of savings banks, including depositors, stand upon an equal footing. The court says : " Upon insolvency the assets and property of the corporation, as in the case of other corporations, is a trust fund for the payment of creditors, and depositors we think stand as other creditors, having no greater but equal rights to be paid ratably out of the insolvent estate."

In the case of *Huntington* v. *Savings Bank* (96 U. S. Sup. Ct. R., 388), speaking of savings banks, the court says : " It is not a commercial partnership, nor is it an artificial being the members of which have property interests in it, nor is it strictly eleemosynary. Its purpose is rather to furnish a safe depositary for the money of those members of the community disposed to intrust their property to its keeping. It is somewhat of the nature of such corporations as church wardens for the conservation of the goods of a parish, the College of Surgeons for the promotion of medical science, or the Society of Antiquaries for the advancement of the study of antiquities. Its purpose is a public advantage without any interest in its members."

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

" It is, like many other savings institutions incorporated in England and in this country during the last sixty years, intended only for provident investment, in which the management and supervision are entirely out of the hands of the parties whose money is at stake, and which are *quasi* benevolent, and most useful because they hold out no encouragement to speculative dealing or commercial trading."

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

" Very many such exist in this country. Among the earliest are some in Massachusetts, organized under a general law passed in 1834, which contained a provision that the income or profit of all deposits shall be divided among the depositors with just deduction of reasonable expenses. They exist also in New York, Pennsylvania, Maine, Connecticut and other States. Indeed, until recently, the primary idea of a savings bank has been that it is an institution in the hands of disinterested persons, the profits of which, after

deducting the necessary expenses of conducting the business, inure wholly to the benefit of the depositors in dividends or in a reserved surplus for their greater security."

Courts of equity in other States have exercised the power here sought. In the case of *Matter of Newark Savings Institution* (28 N. J. Eq. R., 552), the power to scale down deposits and authorize the resumption of business by savings institutions was distinctly declared and exercised. The chancellor says: "This court has jurisdiction over all trusts, as well where the trust is held by a corporation as where the trustee is an individual. A savings institution, such as the petitioner, is a mere trustee. It has no stock. It receives the money of depositors for investment and invests it on securities taken for the general benefit of the depositors. It is merely a large incorporated agency for receiving and loaning money on account of those to whom the money belongs. The interest received upon investments is to be ratably divided among the depositors. * * * The depositors (in the absence of fraud on the part of the managers, from which personal liability would arise), have no recourse whatever for repayment of their principal or interest to anything, except the general investments of the institution. The institution now before me was incorporated for the sole purpose of receiving and investing deposits. The design of the legislature in granting the charter was to promote industry and frugality, and preserve and husband the fruits of honest toil. It contemplated no benefit to the managers, but looked only to the security and advantage of the depositors. The trust thus created is a general or public trust. No depositor has, under the charter or in equity, any right to any particular security in the hands of the institution for his deposit more than any other depositor. All the assets, after deducting necessary expenses, are held as a common fund for the security of all the depositors. It follows that no depositor has any reason for complaint if he is not permitted to receive his deposit in full, if there be even any uncertainty as to whether there will be assets enough to pay all the others in full. It follows, also, that the institution ought not, under such circumstances, to be permitted to exhaust such of its securities as are immediately convertible into cash without loss in the payment in full of clamorous or alert depositors, and leave for those who are less vigilant, or who may be less informed

of the situation, the securities which are less available and on which such loss may be sustained, as that the latter may fail to realize the full amount due them.    In other words, the vigilant depositor ought not to be permitted to devolve all the losses of the trust on the others who are as much entitled to payment in full as they are. To insure justice to the helpless is one of the most valuable prerogatives of this court.    Equality in the present case is equity. I have no doubt as to the jurisdiction of this court over the subject, and I have no hesitation whatever in exercising it.    Under the circumstances, I deem it my duty to see to it that the assets of this trust in the hands of the institution are not inequitably administered."

\*        \*        \*        \*        \*        \*        \*

" The course now taken in regard to this institution is not without precedent in this court.    In the case of the Hoboken Bank for Savings (1874) like measures were taken by me under similar circumstances with salutary effect and most beneficial results to the depositors."

In 1871 a similar proceeding for scaling down the deposits of a savings bank was taken in Connecticut.    In that case a sum equal to twenty-four per cent of the deposits then in the bank was scaled by the trustees themselves, and a joint resolution was subsequently passed by the legislature ratifying their action.    Afterwards an action was brought by one of the depositors to recover the difference between his deposit and the amount to which it was scaled, and the Supreme Court, without giving any effect to the resolution of the legislature, held that the action of the trustees in thus scaling down the deposits was lawful and proper, and that the depositor could not recover.    Like proceedings have been had in New Hampshire, where there is a statute authorizing them.    In Massachusetts, in the case of *Lewis* v. *Lynn Institution for Savings* (148 Mass., 235), the rule laid down in the Connecticut case was approved and applied. At page 244 the court says : " But to the depositors themselves the undertaking of the corporation is that it will receive and combine the deposits, and manage and use them to the best practicable advantage according to the judgment of the trustees, and give to the depositors in just proportion among themselves the benefit of the result of such management.    There is no absolute promise to repay to any depositor the full amount of his deposit at all events.    Such

a promise to one depositor would imply that in case of loss he should be repaid out of the deposits of others. But the promise or undertaking of the corporation is the same to all. There is no promise to pay one at the expense of others. The promise is, in effect, to pay each depositor in full with his dividends provided the assets are sufficient, and if they are not sufficient, then to pay each one his proportionate share."

It seems, therefore, that the application now made is supported by the provisions of the statute above quoted, and by well considered adjudications in this and other States. I think the power of the court is clear, and that the present presents a proper case for its exercise.

On appeal to the General Term the order was affirmed *pro forma.**