FRED F. LAWRENCE, Bank Commissioner, In Equity

*vs.*

LINCOLN COUNTY TRUST COMPANY.

Lincoln.    Opinion December 8, 1923.

*A depositor, as a general rule, who is indebted to the bank, is entitled to set off the
amount to his credit against his indebtedness even though the bank is insolvent.
But in case of segregation of depositor's notes under R. S., Chap. 52, to
secure a savings account, the deposit cannot be set off against such
segregated notes.*

In the instant case the bank holds such segregated notes in trust to secure the
savings account. Its liability to depositors is not as such trustee. Hence the
right of set-off does not apply. Neither does the right of set-off apply in case
of a deposit marked "special" and intended by the depositor to be used in
payment of such note, even though such intention be known to the treasurer
of the bank, provided that the deposit remains under the exclusive control of
the depositor and subject to withdrawal by him.

A vote authorized the segregation of notes as provided by statute. The segre-
gated notes were not stamped. No record was made in any so-called invest-
ment book. The daily balance ledger was however adopted as an investment
book by stamping upon it the words "segregated for savings acct." and bracket-
ing after these words on each page certain listed assests including notes.

The court does not approve the procedure adopted but holds that it is not so
defective as to defeat the purpose of the Legislature and the intention of the
bank to provide security for all savings depositors.

On report. A petition in equity brought by the Receivers of the
Lincoln County Trust Company in the name of the Bank Com-
missioner seeking from the court instructions as to the discharge of
their official duties.

The main question involved was whether, as between the bank
and the depositors, the deposits of the various depositors who had
given notes to the bank, or were responsible on notes, either as
makers, endorsers or sureties, should have offset as against their
liability to the bank to the amount of their deposit. A hearing
was had upon the petition of the Receivers, and by agreement of

the parties the cause was reported to the Law Court on an agreed statement of facts, the Law Court to render such decision thereon, and give such instructions as may be equitable and proper. The receivers were instructed as defined in the opinion.

The case is fully stated in the opinion.

*Walter S. Glidden,* for petitioning receivers.

*Arthur S. Littlefield,* for respondent depositors.

SITTING: CORNISH, C. J., HANSON, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

MORRILL, J., dissenting.

DEASY, J. Walter S. Glidden and W. C. Day, Receivers of the Lincoln County Trust Co., on May 9, 1923, made application for instructions as to "whether they shall allow to the makers, sureties and endorsers upon notes due or payable to said Lincoln County Trust Co., the amount of the respective deposits" of said makers, etc. Certain depositors in the Trust Co., who are also liable upon notes held by it, appeared and were heard and are herein referred to as intervenors. Upon hearing, the matter was reported to the Law Court.

The relation between a trust company or national bank, and the depositors and borrowers with whom it deals, is ordinarily that of debtor and creditor. The right of set-off applies precisely as it does between individuals. "As a general rule a depositor who is indebted to the bank is entitled to set off the amount to his credit against his indebtedness even though the bank is insolvent." 7 Corpus Juris, 652, and 3 R. C. L., Page 588, and cases cited in each. But an important change in this relation is wrought when a trust company proceeding by authority of R. S., Chap. 52, Secs. 90-1-2, as amended, segregates and sets apart certain assets as security for savings depositors.

The statute, omitting non-essential parts, is as follows: "Every trust company soliciting or receiving savings deposits . . . shall segregate and set apart and at all times keep on hand so segregated and set apart assets at least equal to the aggregate amount of such deposits.

"Such assets so segregated and set apart shall be held for the security and payment of such deposits, and shall not be mingled with the other assets of the company, or be liable for the debts or other obligations thereof until after such deposits have been paid in full. . . . .

"Such segregated assets shall be so held and recorded as to identify them as the assets held for the security of such deposits. All notes . . . . representing such assets shall be plainly stamped 'Savings Department,' provided however that in lieu thereof it shall be lawful to record in the investment book a description of assets so held sufficient to identify them."

The theory of the intervenors is that the assets required to be segregated do not include notes of depositors at their full face, but at their face less deposits of the makers and indorsers.

For example, a bank has a note for $5,000 given by A, who has a deposit of $2,000. The bank segregates the note as security for savings deposits.

The theory of the intervenors is that such segregated note is today security for $3,000 only, though tomorrow if the deposit is withdrawn the security may become $5,000, and the next day if the maker should deposit $5,000 the security would utterly vanish. In the last analysis our problem is to determine the meaning of the word "assets" as used in the statute above quoted. Doubtless the Legislature might have employed the term as meaning a balance subject to constant fluctuation. It can hardly be presumed that this was the intended meaning.

In the frequently published bank statements the term "assets" includes notes, not balances between notes and deposits of makers. All deposits are listed as liabilities.

Appended to the printed case, that we are now considering, is a leaf from the daily balance ledger used by the Lincoln County Trust Co., being in form the same commonly used by banks. Under the heading "Assets" there are listed the same loans which are segregated as security. The sum carried out after the word "loans," and intended so to be carried out, is obviously not the balance after deducting deposits of makers. These and all other deposits are set down as liabilities.

The word "assets" as ordinarily used by bankers includes notes at their face less payments, if any, and less depreciation if they have

been charged down, but without deducting deposits of persons liable on such notes.

It is probable that the Legislature used the term "assets" in the sense in which it is commonly used. It is improbable that it intended to have set off as security for savings depositors, balances subject to daily and hourly fluctuations beyond the bank's control.

The true theory is that the bank holds segregated assets for the savings depositors. As a holder of segregated notes it is a trustee. As a debtor to depositors it is not. The corporation is the same; the capacity is different. Therefore, the principle of set-off does not apply.

The eminent counsel for the intervenors relies with confidence upon the statute regulating set-off of demands. R. S., Chap. 87, Sec. 75. The statute, omitting words not germane to the present discussion reads: "A demand originally payable to the defendant in his own right . . . . may be set off."

If the statute provided that *all* demands originally payable to the defendant in his own right should be set off absurdity of result would preclude literal construction. "Mutuality is implied in the word set-off." *Collins* v. *Campbell*, 97 Maine, 27.

"A cardinal rule in the interpretation of statutes of set-off requires that there be a mutuality of demand both as to the quality of the right and the identity of the parties." *Hunter* v. *Henning*, 259 Penn., 347; 103 Atl., 61.

A demand against the plaintiff individually though "originally payable to the defendant in his own right" cannot be set off if the plaintiff sues as administrator or trustee. In order that a demand may be set off it must be a demand against the plaintiff, or if the plaintiff be merely nominal or representative, then it must be against the real plaintiff.

Set-off whether a set-off of demands under the statute or a set-off of judgments at common law is a right which the defendant may interpose against the plaintiff *in interest*. Judgments may be set off "when the parties in interest are the same." *Pierce* v. *Bent*, 69 Maine, 385; *Moody* v. *Towle*, 5 Maine, 416.

"The defendant in an action by a trustee in his capacity as such has the same rights as regards set off that he would have against the cestuis que trust." 25 A. & E. Ency., 533. "The relation of

a trust company to its depositors in the savings department is that of a trustee to his cestuis que trust." *Kelley* v. *Commissioner*, 239 Mass., 298.

A trust company holding in trust for the savings depositors a note which has been segregated for the purpose brings suit upon it for the benefit of such depositors. If the theory were true that what is segregated is the fluctuating balance between the amount of the note and the deposits of makers its and indorsers, set-off should be allowed because after such allowance all of the trust fund represented by the note would be recovered.

But if as this court holds, it is the note that is segregated and held in trust, set-off cannot be allowed in a suit brought for the benefit of the savings depositors for several cognate reasons: (1) the demand sought to be set off is not against the plaintiff in the capacity in which he sues, (2) the demand is not against the plaintiff in interest, and (3) such allowance would defeat in part the recovery of the trust fund.

All this is not important so long as the bank is solvent. In such case the depositor does not need to resort to a plea of set-off. He can draw his deposit and pay his note.

And in case of insolvency, denial of set-off does not injure the savings depositor if the segregated assets are sufficient to secure the payment of all.

But insolvency plus deficiency of security make set-off important. To allow it, however, would deplete the trust fund and in part defeat the purpose of the law.

Few of the cases cited are pertinent. Indeed, it seems that but few cases directly in point have been decided by courts. Some cited cases have reference to the ordinary relations between banks and their customers when there has been no setting apart or segregation of assets as security. It is conceded that in such cases the right of set-off obtains precisely as between individual debtors and creditors.

Other authorities presented relate to savings banks. It is uniformly held that savings bank depositors who are debtors to the bank have no right of set-off. The reason is that savings bank depositors are not creditors of the bank, except in a limited sense. They occupy a position, sui generis, but resembling that of stockholders. *Coggswell* v. *Bank*, 59 N. H., 43; *Lewis* v. *Institution for Savings*, 148 Mass., 235.

Trust Company depositors are denied the right of set-off against their segregated notes, but for a different reason. A trust company is a debtor to its depositor. As holder of its depositor's notes it is also a creditor. If both debtor and creditor in the same right, in the same capacity, the principle of set-off must apply. But it holds segregated notes in trust. Its liability to depositors is not as trustee. Hence the right of set-off does not apply.

Turning to the authorities bearing upon controverted issues in this case: *State* v. *Brobston*, 94 Ga., 95, 21 S. E., 146, is confidently relied upon by counsel for the intervenors. The Georgia statute provides in substance that when a bank is a depository of public funds the State shall have "a first lien on all the assets" of the bank. It was held that the lien attaches only to balances due on notes after deducting deposits of makers. This case lends some support to the theory of the intervenors in the meaning that it ascribes to the word "assets." If the Georgia statute provided that certain assets should be segregated and set apart as security for public deposits and if the Georgia Court had decided that notes so segregated as security were subject to be reduced even to the vanishing point by deposits, upon which the State has no lien, the case would be directly in point.

All other authorities that have come to our attention deny the right of set off to the *commercial* depositor as against his note in the savings department. As to whether *savings* depositors are entitled to set off the authorities are not entirely uniform.

*Upham* v. *Bramwell*, (Ore.), 210 Pac., 706, 25 A. L. R., 932.

This case holds (1) that a depositor having a note in the commercial department is entitled to set off. That this is true goes without saying. (2) that a savings depositor having a note in the savings department also has the right to set off, but (3) that a commercial depositor having a note in the savings department has not the right.

The Massachusetts cases are opposed to the theory of the intervenors so far as concerns commercial depositors. They do not pass upon the rights of savings depositors.

*Kelley* v. *Com'r of Banks*, 239 Mass., 298, 131 N. E., 855. Debtor to savings department cannot have commercial deposit set off.

*Trust Co.* v. *Rosenbush*, 239 Mass., 305, 131 N. E., 858. Same rule applied as in Kelley case notwithstanding depositor's note was discounted in commercial department and without his knowledge transferred to savings department.

*Tremont Trust Co.* v. *Baker,* (Mass.), 137 N. E., 915. Same rule applied as in Kelley Case notwithstanding agreement by bank to allow set off.

The Massachusetts statute differs from that of Maine in that the former requires savings deposits to be kept distinct from other deposits and invested separately, and in that savings depositors have as security only assets derived from investments of savings deposits.

It is not easy to perceive that these differences affect the right of set off. In both states the same corporation is creditor of, and in debt to, the same person at the same time. But as creditor it is a trustee; as debtor it is not.

*Lippett* v. *Thames Loan & Trust Co.,* 88 Conn., 190, 90 Atl., 369. Debtor to savings department cannot have his deposit in either commercial or savings department set off.

The Connecticut statute is much like that of Massachusetts. It segregates savings department investments, and such investments only, as security for savings depositors. The reason for the decision in the Lippett Case is that "The depositors in this (savings) department were the equitable owners of the savings (segregated) assets." This is but another way of stating that the Trust Company held the notes in trust for the savings depositors. A note held in trust is not subject to have set off against it a debt of the trustee unless it is a debt for which he is liable as trustee.

Both reason and authority are opposed to the theory that commercial depositors are entitled to have their deposits set off against their segregated notes.

The same rule we think must be applied in case of savings depositors. The savings depositor who is also a debtor must share proportionately with his co-depositor who is not a debtor. As to this, however, as above appears, the authorities are not entirely uniform.

But every reason for denying set-off to commercial depositors applies to savings depositors. The solution of the problem harks back to the original question, the meaning of the word "assets" as used in the statute, which aims to provide "security." Does it include merely the elusive balance, or does it mean the appraisable note? We hold the latter to be the true meaning. The trust com-

pany held the notes as trustee. It owed its depositors but not in its capacity of trustee. There is no mutuality in "the quality of the right." Set-off must be denied.

"The relation of a trust company to its depositors in the savings department is that of a trustee to his cestuis que trust, while its relation to its depositors in the commercial department is that of a common law debtor." *Kelley* v. *Commissioner*, (Mass.), supra.

"The depositors in this department were the equitable owners of the savings assets . . . . Each depositor had an equal right to his proportional share of all the funds of this department." *Lippett* v. *Trust Co.*, (Conn.), supra. See note 25 A. L. R., 938.

Answering a minor question propounded by the receivers we hold that a depositor's intention to apply a certain deposit marked "Special" to the payment of his segregated note does not entitle such depositor to the right of set-off, even though such intention is made known to the treasurer, provided the deposit remains under the exclusive control of the depositor and subject to withdrawal by him.

The intervenors further contend that the Lincoln County Trust Company failed to legally and effectually segregate and set apart any notes. As before stated, if there were no legal segregation the right of set-off exists as it does between any debtor and creditor.

Two votes were passed by the executive committee or directors providing for the segregation of assets to secure savings depositors. One passed in 1919 covered "stocks and bonds, all loans including mortgage and chattel." The other passed in 1922 covered "all stocks and bonds, mortgage, collateral and time notes."

The segregated notes were not stamped "Savings Department." No record was made in any so-called investment book. To carry the votes into further effect the bank caused to be stamped on each page of its daily balance ledger under the heading "Assets" the words "Segregated for savings acc't," which words were bracketed against the following items of assets . . . . . "Stocks and Bonds, U. S. Bonds, Loans on Collateral and Chattels, Loans on Mortgages of R. E., Other Loans."

This method is crude. It cannot be commended. But the act should receive a liberal construction. The savings depositors for whose security it was passed were not responsible for the bank's loose methods. The purpose to segregate assets plainly appears. The items to be segregated are indicated with reasonable certainty.

No one of the specific objections nor all combined are fatal: It is objected that a trust company cannot legally set apart all of its assets as security for savings depositors. The Lincoln County Trust Co., did not undertake to do this. Assets having a book value of more than $36,000 were not so set apart.

True, it did not record a description of segregated loans. All loans being segregated such specification was not essential for the purpose of identification.

It had no investment book, so called. But it adopted the daily balance ledger as an investment book.

It is objected that it attempted to segregate non-existing assets. Not so. The weekly entry upon the bank's improvised investment book as plainly related to existing assets as would a formal record made at the same time in an investment book in the most approved form. In either case the record is made as authorized by votes properly including and relating to assets to be acquired.

While we do not approve the procedure adopted we think that it is not so defective as to defeat even in part the purpose of the Legislature and the intention of the bank to provide security for all savings depositors.

The receivers are instructed as above.

MORRILL, J. Dissenting. I concur with all the conclusions of the opinion, except on the main question of an actual segregation of assets, as claimed by the receivers, for the security of the savings deposits. After a careful study of the case I cannot escape the conclusion that the officers of Lincoln County Trust Company never legally made such segregation. As all my associates think otherwise I should hesitate to express my views except by a mere statement of non-concurrence, did I not think that the case shows not only no segregation, but a persistent disregard of the provisions of law enacted for the protection of both savings and commercial depositors in trust companies, which should not be permitted to pass unnoticed.

I think that we agree that a mere vote to segregate is not sufficient; that the securities must be actually set aside for the purpose indicated, and must not thereafter "be mingled with the other assets of the company," while such segregation continues; they should be kept in a class by themselves and accounted for as other trusts. I do

not see how there can be such actual legal segregation unless the securities are designated, or a definite, permanent record is made, as plainly directed by statute.

The use of the rubber stamp, once a week, by a clerk in transferring the ledger balances from one leaf of the trial balance loose leaf ledger to the leaf for the following week, lacks all the elements of a permanent record. The five items of assets alleged to be segregated were printed on the trial balance sheet consecutively in the following order, "Stocks and Bonds," "U. S. Bonds," "Loans on Collateral and Chattels," "Loans on Mortgages of R. E.," "Other Loans"; and were numbered 1, 2, 4, 5, 6; between the items "U. S. Bonds" and "Loans on Collateral and Chattels" a blank line numbered 3 appears. Upon at least two copies of the case furnished the court the fac simile of the trial balance sheet, showing the method of using the rubber stamp, shows that the stamped bracket does not include the item, "Other Loans," and that the stamp used was not long enough to include that item; if used so as to include "Other Loans," the item "Stocks and Bonds" could not be included.

The description of the results shown on the books by the use of the rubber stamp indicates the loose, inexcusable banking methods adopted.

An analysis of the condition of the bank on March 14, 1923, when it closed its doors, shows: Savings Deposits          $366,955.13

### OTHER LIABILITIES

| | |
|---|---:|
| Certificates of deposits | $    300.00 |
| Demand deposits | 79,764.60 |
| Bills payable | 10,000.00 |
| | $90,064.60 |

Assets claimed to be segregated:

| | |
|---|---:|
| Stocks and bonds | $304,043.31 |
| Loans, coll. and chattels | 10,515.00 |
| Loans on mortages of R. E. | 53,165.88 |
| | $367,724.19 |
| Other loans | 116,262.88 |
| | $483,987.07 |

Other assets:

| | |
|---|---:|
| Banking house | $24,000.00 |
| Other real estate | 7,231.50 |
| Cash on deposit | 2,305.45 |
| Cash on hand | 2,653.19 |
| | $36,190.14 |

It will be observed that the items of Stocks and Bonds, Loans on Collateral and Chattels, and Loans on Mortgages of Real Estate exceed by $769.06 the amount of Savings Deposits, an entirely reasonable amount; add the item "Other Loans," and the total exceeds the savings deposits by $117,031.94. Sec. 90 of Chap. 52 of the R. S. does not fix any maximum amount of assets to be segregated; it provides that they shall be "at least equal to the aggregate amount of such deposits." In the absence of such statutory maximum the court perhaps cannot say as a matter of law that an overlay in value of nearly $33\frac{1}{3}\%$ of the savings deposits, although apparently excessive, is unlawful.

In my opinion, however, the law does not contemplate any such segregation in bulk of different classes of assets, or, as here, of the entire invested assets of the bank except the real estate; in the instant case the only remaining assets are the banking house, other real estate, cash on deposit and cash on hand. To such a proceeding the provision that the "assets so segregated  .  .  .  .  shall not be mingled with the other assets of the company" (R. S., Chap. 52, Sec. 91) has no application. It is safe to say that the Legislature never intended to authorize the directors to give the savings depositors a prior lien upon all the invested quick assets of the company, leaving the equity to the commercial depositors.

The following section (Section 92) to my mind makes this clear; it provides:—"All notes, certificates of stocks, bonds and other securities representing such assets shall be plainly stamped 'Savings Department'; provided, however, that in lieu thereof it shall be lawful to record in the investment book a description of assets so held sufficient to identify them." The first method of identification was not followed. The opinion seems to proceed on the theory that the use of the rubber stamp may be considered equivalent to the second method. This is the first time, I think, that a daily trial balance sheet, showing mere balances of the various ledger accounts

making up the total assets and liabilities of the bank, was ever regarded as an "investment book," in which could be recorded a description of segregated assets. The statute clearly indicates that each item, each bond, or mortgage, or note, so segregated, shall either be stamped or so recorded in the investment book which necessarily lists each investment.

It may be said that this construction of the statute is too strict, that it unduly clings to the letter of the law and disregards its spirit; that a construction should be adopted, if possible, which will render the statute effective in the present case for the security of the savings depositors. Upon this ground, as I understand the opinion, it sanctions, but does not approve, the procedure of the bank.

With such loose banking methods shown, nothing should be presumed, or receive sanction, upon liquidation of the bank, which will favor one class of depositors as against another. While the law as to segregation should receive a liberal construction in the interest of the savings depositors for whose security it was passed and who are not responsible for the bank's loose methods as the opinion well says, its administration should be just towards the commercial depositors, who likewise are not responsible for the bank's loose methods, and who equally with the other depositors may have been misled.

To demonstrate the position in which the commercial depositors will be placed if this alleged segregation of assets is recognized, it is only necessary to refer to the bank's report of January 6, 1923, presumably verified by an official examination of the bank. In that statement no mention is made of segregated assets. If the alleged segregation had been given effect, assets carried on the books at $507,137.53 would be regarded as held as security for the payment of savings deposits of $370,206.16; and for the immediate payment of $50,000 borrowed money and $88,469.92 commercial deposits, there remained only cash on deposit, on hand, and overdrafts, amounting to $28,432.45, a bank building carried at $24,000, and other real estate carried at $7,251.50, a total of $59,683.95.

On March 14, 1923 the bank closed its doors; but in the meantime it had reduced its bills payable to $10,000 in part at least by applying to the payment thereof assets, which it is now maintained were segregated, from which it realized more than $20,000. I refer to this latter fact merely to show that so far as the bank was concerned

this alleged segregation was colorable only and a mere evasion of the law. If the alleged segregation is given effect, assets carried on the books at $483,987.07 must be first applied to the payment of savings deposits of $366,955.13; and there will remain cash on hand and on deposit ($4,958.64) a banking house carried at $24,000, and other real estate carried at $7,231.50 (total $36,190.14) available for payment of borrowed money $10,000, and commercial deposits of $80,064.60. It is true that the above figures show an equity above the amount of savings deposits; but how much of that equity will remain upon sale of the securities, it is impossible to tell without an inspection of a list of the securities; the shrinkage may, and probably will be large.

I have said that the action of the bank was a mere evasion of the law. I ought to add that so far as the official statements of the bank's condition show, the Banking Department has not recognized or approved the action of the bank. The various reports of the condition of the trust company at the annual examinations are not made a part of the case; but I have examined them for any light which they may throw on the question. These reports do not disclose any item of assets segregated for the security of savings depositors; they make no mention of segregated assets. That such items, if they existed, should so appear, is obvious; it is as important for the information of stockholders and depositors as other items which usually appear, such as "Trust Department" and "Trust Investments," "Sinking Funds for Corporations" and "Sinking Fund Investments." These reports are for publication. Sections 85, 87. The only inference to be drawn from this state of facts is that the Banking Department having supervision of segregated assets and authority to order the reduction of the figure at which they are carried on the books (Section 90), either knew nothing of the alleged segregation or did not recognize it as complying with the law. The commercial depositors under these circumstances could have no means of knowledge of any such segregation as is now claimed, and the savings depositors were not deceived, or lulled into a false belief that assets had been segregated for their security.

I am, therefore, of the opinion that upon this proceeding for the equitable distribution of the assets, all depositors should share proportionately in all assets, subject to the principles of set-off declared in the opinion, so far as applicable.