**ANDROSCOGGIN COUNTY SAVINGS BANK**

v.

**Elmer W. CAMPBELL, Bank Commissioner.**

Supreme Judicial Court of Maine.

Oct. 27, 1971.

Frederick A. Johnson, Robert W. Smith, Portland, for plaintiff.

Clayton N. Howard, Asst. Atty. Gen., Augusta, for defendant.

Richard B. Sanborn, Augusta, for Maine Bankers Assn., Amicus Curiae.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

This case is before us on report from the Superior Court. It came to the Superior Court pursuant to an appeal from an Order of the Maine State Bank Commissioner, which appeal was in conformity with the provisions of Rule 80B of the Maine Rules of Civil Procedure and 9 M. R.S.A. § 7.

The parties have stipulated the facts and the Superior Court has framed the issues for determination by this Court as follows:

1. Whether or not Plaintiff's actions, on November 2, 1970, in amending its By-Laws to permit a classification of deposit accounts subject to withdrawal by check, and in permitting its depositors and customers to open such accounts, pursuant to said Amended By-Laws, was lawful under the Laws of the State of Maine.

2. Whether or not the Commissioner's Order #1970–2 was in excess of his statutory authority.

The Stipulation of Facts discloses the Plaintiff is a mutual savings bank incorporated by the Maine Legislature by Private & Special Laws, 1870, c. 435.

On November 2, 1970, the Bank's Board of Trustees voted to amend the Bank's By-Laws to authorize the Bank to establish accounts for its depositors and customers which accounts were to be subject to withdrawal by check. Thereafter a total of 21 checking accounts were opened by customers and depositors. On November 3, Bank Commissioner's Order #1970–2 was entered, ordering Plaintiff to discontinue these checking accounts.[1]

It is further established by stipulation that upon receipt of the Order, the Bank, in compliance with said Order

" * * * immediately notified each of its checking account depositors, by mail, of the discontinuance of said depositor's account, and likewise notified the Defendant that under protest, it had complied with his Order. Copies of the above form letter and of the above letter mailed to Defendant by Plaintiff on November 4, 1970 appear as Exhibits G and H respectively."

It is agreed no mutual savings bank in Maine has ever offered and operated checking account services prior to the inauguration of the Plaintiff's service on November 2, 1970.

The real issue in this case, stated simply, is:

Can a mutual savings bank legally operate a checking account service under Maine law?

1. The full text of the Order is as follows: "Commissioner's Order 1970–2

WHEREAS, THE ANDROSCOGGIN COUNTY SAVINGS BANK has allowed its customers to open with it, non-interest bearing, nonpassbook demand accounts, commonly referred to as 'checking accounts.'

WHEREAS, THE ANDROSCOGGIN COUNTY SAVINGS BANK was advised by this DEPARTMENT that the opening of such accounts would be inconsistent with the law.

NOW, THEREFORE, I, ELMER W. CAMPBELL, by virtue of the authority vested in me as Bank Commissioner of the State of Maine, do hereby order and direct the Androscoggin County Savings Bank of Lewiston, Maine, to cancel, revoke, and discontinue all of said checking accounts and cease and desist from accepting deposits for said accounts or from accepting any deposits on any new checking accounts.

s/ ELMER W. CAMPBELL
Elmer W. Campbell
Bank Commissioner"
(S E A L)
Dated: November 3, 1970

A brief examination of the nature and status of savings banks in Maine is helpful in arriving at the answer.

Savings banks have existed in Maine during the entire period Maine has been a State. See Makin v. The Institution for Savings, 19 Me. 128 (1841). In that case the defendant, The Institution for Savings, was organized under the provisions of Massachusetts Special Laws 1819, c. 132.

Shepley, J., speaking for the Court, used these words to describe the nature of the defendant Bank:

"This corporation was designed to afford assistance to those willing to preserve and invest small gains until needed, or until their accumulation would authorize a more permanent investment."

Again in Savings Institution v. Makin, 23 Me. 360 (1844), in speaking of that Savings Bank, he said:

"Neither the charter nor the by-laws make any provision, that those, who should deposit money, should thereby become members of the corporation or have any right to vote or act in any manner in the choice of its officers or in the conduct of its affairs. It was not the design, that they should become members. Poor and improvident persons, females, and minors, were the persons to be especially benefitted. They would be ill qualified to be the managers of their savings, and equally ill qualified to select others for that purpose. The corporators were not designed to be, and there is no proof that any of them were, in fact, the persons, who were interested in the funds held by the corporation. In this respect the organization and character of the corporation differs entirely from banking, manufacturing, and other corporations, created for the transaction of business for the benefit of the corporators."

In In re Newport Savings Bank, 68 Me. 396, 403 (1878), our Court said:

"A savings bank is a trustee for its depositors. Its affairs are managed by trustees, who are required to give no security for the faithful discharge of their trust. It receives the funds of widows and orphans, and the small savings of the laboring classes."

In other cases our Court has consistently said of savings banks and commercial banks, they are quite different one from the other in their very nature. See, for example, Lawrence v. Lincoln County Trust Co., 123 Me. 273, 122 A. 765 (1923).

In In re Application of Howard Savings Institution of Newark, 32 N.J. 29, 159 A.2d 113, 118 (1960), the New Jersey Court said:

"Certain well-known modern banking fundamentals which were implicit in the presentation before the Commissioner and his findings should be mentioned. A mutual savings bank is a different type of financial institution from a commercial bank. Its purpose has frequently been stated as encouragement of thrift by mutuality of ownership."

In In re Wilkins' Will, 131 Misc. 188, 226 N.Y.S. 415 (1928), the New York Surrogates Court said of a savings bank:

"A savings bank is entirely different from a commercial bank in its foundation, its place in the social structure, and in its method of business. A savings bank is an institution for the accumulation of small sums, chiefly the savings of the poorer classes, organized by philanthropic movement, where the trustees give their services gratuitously, the state prescribing the classes of investments. The chief problem of a savings bank is the safe keeping of the funds.

"The commercial bank is one which receives deposits, makes discounts, and issues notes. They are lenders and borrowers. They may or may not pay interest on deposits subject to check. The law gives certain powers to commercial banks which are not invested in savings

banks. Business banks are chartered by both the state and the nation. They may now serve as guardian, receiver, trustee. The depositor pays his debts by orders upon the bank in the form of checks. The savings banks adopt plans to restrain the depositor from making sudden calls for any considerable amount of his deposit. From a social point of view, the commercial bank plays an important part in supplementing the currency of the country. One feature of savings banks is that both their deposits and investments are as a rule of a more permanent character than those of commercial banks."

The Supreme Court of the United States in Bank of Redemption v. Boston, 125 U.S. 60, 68, 8 S.Ct. 772, 776, 31 L.Ed. 689 (1888), expressed the same thought in describing savings banks.

" * * * the main purpose and chief object of savings banks, as organized under the laws of Massachusetts, are the same as those in New York, as considered in the case of the Mercantile Bank. They are substantially institutions, under public management, in pursuance of a great and beneficial public policy, organized for the purpose of investing the savings of small depositors, and not as banking institutions in the commercial sense of that phrase."

An oft quoted description of a savings bank is found in Bulakowski v. Philadelphia Savings Fund Society, 270 Pa. 538, 113 A. 553 (1921):

"A savings bank is an institution organized to promote prosperity of persons of small means and limited opportunities, wherein earnings may be gained on aggregate small deposits, which, after deducting necessary expenses and a reserve for depositors' security, are divided among the depositors. There is no capital stock, nor are there stockholders in such institutions, and it is not a bank in the commercial sense of that word."

We are aware most savings banks in Maine have experienced substantial growth in size during the past few decades. It is quite inaccurate to describe the average depositor in Maine savings banks today as "poor" or to characterize the size of deposits as "small." Nevertheless, the fundamental difference between savings banks and commercial banks in Maine remains the same. Such banks, even today, are not engaged in relatively short-term financing of commercial operations. Although there has been an increasing tendency toward competition between commercial and savings banks in the lending market, savings banks loans continue to be comparatively long-term and more or less permanent. Stringent limitations are imposed upon savings banks by 9 M.R.S.A. § 564 with respect to the making of *"commercial"* loans in the ordinary sense of the word.

It is conceded no savings bank in the State of Maine has ever offered a checking account service prior to the time this Appellant did so. This is not surprising in view of the nature of the institution as above described.

So far as we are aware, no savings bank evidenced interest in providing a checking account service until in 1917 the Camden Savings Bank of Rockport made inquiry of the Bank Commissioner as to its authority to establish such service. This resulted in the then Bank Commissioner's requesting an opinion from the Attorney General.[2]

The Attorney General's Opinion, given under date of February 9, 1917, was as follows:

"February 9, 1917

To Hon. Irving E. Vernon, Bank Commissioner

Re: Checking Accounts—Savings Banks

Replying to yours of January 4th, relative to the right of the Camden Savings Bank of Rockport to conduct a checking branch in connection with the savings

---

2. The Hon. Guy H. Sturgis, later Chief Justice of this Court.

bank, I beg to say that it does not seem to me that the charter of this bank authorizes the bank to open a checking account.

Savings Banks have always been regarded by the Courts as not having any of the attributes of a commercial banking business and to be of a special character devoted exclusively to receiving and safeguarding the deposits of the public, not entering into any sort of a general banking business as carried on by commercial banks, trust companies or like institutions.

I should not consider the word 'reasonable' appearing in the special act of the legislature granting a charter to this bank to permit the maintenance of a checking branch and agree with you that the word can only be considered to refer to the ordinary provisions of our banking law as to notice upon withdrawal, etc. The word 'reasonable' would appear to restrict the bank to making rules concerning withdrawals; inserted perhaps to prevent unreasonable regulations as to notice and in no way giving unusual or special rights or privileges to this bank.

Guy H. Sturgis
Attorney General"

The Appellant argues in its brief, its right to open and maintain checking accounts exists because:

(a) the Maine Statutes specifically permit a savings bank to determine for itself the terms and conditions under which it will accept and repay deposits, and this authority is not limited by any express or implied prohibition with respect to checking accounts;

(b) the reasonably incidental powers of a mutual savings bank include the power to establish and offer accounts subject to withdrawal by check; and

(c) mutual savings banks in Maine are permitted to utilize third party order forms as a normal function of their business.

This Appellant Savings Bank is a creature of the Legislature. All powers which it can lawfully exercise are prescribed by its charter and by statute, 9 M. R.S.A. § 401 et seq. Maine Unemployment Compensation Comm. v. Maine Savings Bank, 136 Me. 136, 3 A.2d 897 (1939). The specific grant of powers is to be found in Sec. 443 of the above Title 9. No place in that Section or elsewhere in that portion of Title 9 which relates to savings banks (Sec. 441 through Sec. 732), are the terms "checking account" or "demand deposit accounts" used in describing the classes of accounts a savings bank may maintain.

Section 443(1) of Title 9, it is pointed out, specifically provides that:

"The powers, privileges, duties and restrictions conferred and imposed upon any savings bank, by whatever name known, in its charter or act of incorporation, are so far abridged, enlarged or modified, that every such charter or act shall conform to this Title. Every such corporation possesses the powers, rights and privileges, and is subject to the duties, restrictions and liabilities herein conferred and imposed, anything in their respective charter or acts of incorporation to the contrary notwithstanding."

Subsection 2 of Section 443 enumerates specific powers of savings banks.

Subsection 2E expressly authorizes savings banks:

"To receive and repay deposits, to lend and invest the same, to declare dividends, and to exercise by its board of trustees or duly authorized officers or agents, subject to law, all such powers as are reasonably incidental to the business of a mutual savings bank;"

Section 477, subsection 5, Title 9, Dividends, reads as follows:

"A savings bank may pay a different rate of dividend on different classes or types of deposits, but it shall regulate the dividend in such manner that each de-

positor shall receive the same ratable portion of dividends as every other depositor of his class.

"Savings banks may also accept sums of money on deposit and issue certificates of deposit providing for payment of interest at a specified rate.

"Savings banks may also accept sums of money for Christmas Clubs or specific purpose accounts on terms to be agreed upon, with provisions for repayment of the same with or without interest."

Section 511 of Title 9 provides as follows:

"A savings bank may receive on deposit, for the use and benefit of its depositors all sums of money offered for that purpose, and may classify and differentiate among deposits on such bases as it may determine. The bank may by vote of its trustees or by bylaws establish minimum and maximum amounts which may be received. Its trustees may refuse any deposit at their pleasure. By appropriate resolution, the bank may provide for the acceptance of nonpassbook accounts on terms deemed appropriate."

It is within one or all of these Sections of Title 9, the Appellant says, its authority to operate a checking account service is found.

■ A checking account service, we find, is not incidental to the operation of a savings bank.

As has been pointed out in the above cited cases, savings banks were never intended to play a role in the operation of the nation's commerce. Such institution was designed to provide the facility through which a depositor could practice thrift and gain from mutuality of savings and mutuality of investment.

The purposes savings banks were originally designed to serve can be accomplished without the maintenance of checking account service. Such service has never

been considered incidental to the operation of such institutions.

Checking account services are traditionally a necessary part of commercial banking. Indeed, the entire monetary system of this nation is substantially dependent upon such easily negotiated instruments. Because money received in "checking accounts" or "demand deposit accounts" must be readily available to meet the demand, which may be made upon such accounts, such money cannot be used for long-term capital investments. Savings banks have traditionally invested moneys received on deposit in long-term or more or less permanent investments, such as real estate mortgages.

■ Checking accounts are foreign to the scheme and purpose of encouraging thrift by mutuality of ownership and mutuality of investment, to be accomplished by long-term investments.

■ We reject the argument that the phrase "reasonably incidental to the business of a mutual savings bank" found in subsection 2E of Section 443, Title 9, authorizes savings banks to offer and maintain checking accounts.

Plaintiff cites Hudson County National Bank v. Provident Institution for Savings, 44 N.J. 282, 208 A.2d 409 (1965), as authority for the position it takes. There the language of the Banking Act of 1948, N.J. S.A. 17:9A 26(1), read in part as follows:

"To receive money on deposit, to be repaid, upon such terms, not inconsistent with this act, as may be agreed upon between the depositor and the savings bank, *according to the usual custom of savings banks*." (Emphasis supplied)

In disposing of the issue raised, the Court said:

"When this provision was enacted a number of the savings banks had checking accounts and the banking interests concerned as well as the Commissioner

of Banking and Insurance knew of this practice. It seems fair to say that the subject was a matter of some controversy within banking circles. We are told the Legislature resolved the dispute by the expression 'the usual custom of savings banks.'

"Three views of 'the usual custom of savings banks' are advanced. Plaintiff, a commercial bank, contends that since numerically a majority of savings banks did not accept checking accounts in 1948, it was not a 'usual custom' to do so, and hence the 1948 act should be read to prohibit such accounts notwithstanding the existing practice. Defendants and the Savings Banks' Association insist the quoted language was intended to recognize the validity of the practice. The New Jersey Bankers Association offers a middle ground, i. e., that although savings banks may receive such deposits, they may do so, in the words of its brief, only 'upon the same conditions, limitations and reservations as were applicable in 1948 to four out of the five savings banks then maintaining checking accounts.'

"These several views emphasize the indecisiveness of the words 'the usual custom of savings banks.' A purpose to ban checking accounts or to confine them in the manner suggested by the New Jersey Bankers Association could easily have been stated in unmistakable terms so as to leave no doubt of the legislative will. The matter is wholly one for statutory regulation. The question whether commercial banks alone should offer checking services obviously does not turn upon any principle of common law. The opportunity remains with the Legislature to amend the banking laws if it disagrees with the Commissioner's view that the statutes authorize savings banks to offer checking account services."

In Maine, unlike the situation in New Jersey, we have no history of savings banks offering checking account service.

In *Hudson County National Bank*, supra, the administrative determination (Commissioner's view) had been that savings banks could offer and maintain checking account services. Absent legislation in "unmistakable terms so as to leave no doubt of the legislative will," the Court said the administrative interpretation must be considered to have been acquiesced in by the Legislature.

In Maine the converse is true. The administrative interpretation of Bank Commissioners, at least since the advice of the Attorney General given in 1917, has been that savings banks cannot offer and maintain checking accounts.

The decision in *Hudson County National Bank*, supra, we view as indicative of a position contrary to that urged upon us by the Appellant because the Court there premised its conclusion upon the apparent legislative acquiescence in prior administrative interpretation and the practice consequent upon it.

Also cited is Savings Bank of Baltimore v. Bank Commissioner, 248 Md. 461, 237 A.2d 45 (1968). In that case the Court said:

"At the trial of the case below, the appellants were able to show that six mutual savings banks in Baltimore, including Metropolitan, prior to its merger into the Bank, had permitted depositors to make withdrawals by check or to maintain checking accounts; that the existence of such accounts had been known to the Bank Commissioner since 1910, had been the subject of comments by him, but had not been prohibited; and that in the year 1965, immediately preceding the threat of action by the Commissioner, the Bank had issued 73,000 treasurer's checks to depositors making withdrawals and sold 247,000 money orders."

\* \* \* \* \* \*

"We fail to find in the bank's charter or in the applicable statutes the expression of legislative intent or the denial of au-

thority urged on us by the appellees. Moreover, the circumstance that mutual savings banks have permitted withdrawals by check since 1869, and since 1910 with the knowledge and at least tacit consent of the Bank Commissioner, is not lightly to be swept aside."

In the case before us we find in subsection 5, Section 477, Title 9, on which Plaintiff partly relies, the words:

"Savings banks may also accept sums of money for Christmas Clubs or special purpose accounts on terms to be agreed upon, with provision for repayment of the same with or without interest."

And in Section 511 of Title 9, reliance is placed on the use of the words, "The bank may provide for the acceptance of non-passbook accounts on terms deemed appropriate."

■ We cannot say the words in either of these two sections are "unmistakable terms so as to leave no doubt of the legislative will" to authorize savings banks in Maine to offer and maintain checking accounts.

We must assume the Legislature was aware of the administrative interpretation given to Maine banking laws by various banking Commissioners and was aware of the opinion of the Attorney General given in 1917 when it amended the statute in 1969. Certainly clearer words would have been chosen if it was intended to disagree with the Commissioner's view and the At-

torney General's view that the statutes did not authorize checking accounts in savings banks.

As the New Jersey Court said when a similar issue was before them in *Hudson County National Bank*, supra:

"The matter is wholly one for statutory regulation. The question whether commercial banks alone should offer checking bank services obviously does not turn upon any principle of common law."

We say here, as did that Court, the option remains with the Legislature to amend the banking laws if it disagrees with the Commissioner's views.

■ To the first issue framed by the Superior Court for determination by this Court, i. e., (1) Whether or not Plaintiff's actions, on November 2, 1970, in amending its By-Laws to permit a classification of deposit accounts subject to withdrawal by check, and in permitting its depositors and customers to open such accounts, pursuant to said Amended By-Laws, was lawful under the Laws of the State of Maine, we must answer in the negative.

■ To the second question so framed, i. e., (2) Whether or not the Commissioner's Order #1970-2 was in excess of his statutory authority, we answer it was not.

The entry must be,

Appeal denied. Bank Commissioner's order affirmed.

All Justices concurring.