# West's Appeal.

1. The Philadelphia Savings Fund Society is not a charity, but a business corporation.

2. The Acts of 26th April 1855 and 17th April 1869 (Escheat) do not apply to this society.

3. The words "gift, devise, bequest, legacy," in the charter, denote only *means* to effectuate its purposes and do not indicate its purpose or design.

4. The power given to "improve and augment" the property of the society, is to furnish adequate security for repayment of depositors.

5. The fund thus created is not property without an owner.

6. The society is not an object of escheat.

7. The proceeding to escheat property held by a corporation contrary to the Act of 1855 is by quo warranto.

8. The auditor-general's commission to a deputy escheator under the Act of 1855, is without authority and confers no power to proceed, viewing the case as a charity.

9. The Act of 1869 does not provide a mode for enforcing an escheat of property without a rightful owner.

10. A proceeding in such cases by the auditor-general and the escheator is not that of a sovereign, but for want of authority, is illegal and void of sovereign sanction.

11. Process of the court acts on them as individuals and not on the state.

February 7th and 8th 1870.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Supreme Court at Nisi Prius: In Equity: Of January Term 1870.

The appeal was by George S. West, deputy escheator, in a decree on a bill filed against him December 4th 1869, by the Philadelphia Saving Fund Society.   On the same day on which the bill was filed the plaintiff moved for a special injunction and filed affidavits (those hereafter referred to as taken before the deputy escheator).   The plaintiffs in the bill were incorporated February 5th 1819.   The act of incorporation recited that "a voluntary association of a number of the citizens of Philadelphia and the neighborhood, under the title of the Philadelphia Saving Fund Society, has for some time existed, and has been established for the sole purpose of receiving and investing in public stock or substantial security on real estate, such small sums as may be saved from the earnings of tradesmen, mechanics, laborers, servants and others; and of affording to industrious persons the advantages of security and interest:" * * * and enacted

Sect. 1. That Andrew Bayard and others be a * * * body

corporate * * * to have, purchase, receive, take, hold, possess, enjoy and retain lands, rents, &c., stock, goods, chattels and effects of what kind, nature or quality soever, &c., by gift, grant, demise, bargain and sale, devise, bequest, testament, legacy, loan, deposit or advance, or by any other mode of conveyance, &c., and the same to give, grant, &c., and also to improve and augment the same in such manner and form as the said society, by their by-laws and regulations, shall order and direct, and shall and may apply the same, with the rents, issues, profits, &c., and the moneys arising from the same by alienation, disposal or employment thereof, to the uses, ends and purposes of their institution, according to the rules, regulations and orders of their society now in force, or which, according to the provisions hereinafter made, shall from time to time be declared, touching the same, as effectually and fully as any natural person or body politic or corporate within this state, &c., can do and perform; and the said society may * * * do and execute all and singular such acts, matters and things which to the said corporation shall or may appertain, and be necessary for the purposes thereof, subject, nevertheless, to the rules, regula-tions, restrictions, limitations and provisions herein prescribed and declared.

Sect. 2. "The following rules, &c., shall form and be funda-mental articles of the constitution of the corporation : * * *

Art. 3. " No emolument whatever shall be received by the presi-dent or managers for their services.

Art. 4. " The money deposited shall bear interest at the rate of four and eight-tenths per cent. per annum, and shall be repaid when required, upon two weeks' notice, with the interest thereon to the time of such notice. * * *

Art. 13. " A report shall be annually prepared by three audi-tors, who shall not be managers or officers of the corporation, chosen by the board; and such report shall be published in one or more of the gazettes of the city of Philadelphia, and the man-agers shall annually transmit one copy of the said report to the Speaker of the Senate, and one copy to the Speaker of the House of Representatives. * * *

Sect. 4. " If, at any time, the said corporation shall misuse or abuse any of the privileges granted by this act, or if it shall appear that the said privileges are injurious to the citizens of this Commonwealth, the legislature shall have power to revoke and annul them at any time they may deem the same expedient."

The auditors provided for by the 3d article in the 2d section of the act of incorporation made a report showing the state of the society, January 1st 1869, viz. that the investments and cash of the society amounted to $6,436,815.63; that there was due by them on their real estate a dower mortgage of $7666.67; that

there was due to depositors $5,765,280.63, leaving "contingent fund to cover losses $663,868.33."

The Act of April 26th 1855, Pamph. L. 331, Purd. 145, provides :—

Sect. 8. "Any literary, religious, charitable or beneficial society, congregation, association or corporation having capacity to take and hold real and personal estate within this Commonwealth, may acquire and hold the same to the extent, in the aggregate, of the clear annual value of $5000, and to no greater extent without an express legislative sanction : * * * * Provided, That any property now held, as aforesaid, in excess of such value, shall not be hereby invalidated or prejudiced in title or otherwise."

Sect. 12. "To avoid the evil of an indefinite increase of the property in mortmain and perpetuity, it shall not be lawful for any religious, charitable, literary or scientific society, association or corporation, present or future, to accumulate income into capital or invested estate so as that the clear annual value thereof, as regards future acquisitions with those now held, shall exceed the limitation hereinbefore contained; and as regards acquisitions now held by or for any such body shall not exceed said annual amount, except as the property now held does, or, being made more productive, may exceed such amount, but all such clear income, after such amount of capital or invested estate shall be attained, shall be expended, annually, in and for the purposes, uses and trusts upon and for which the property producing it is held, and if there be not objects within the intent of such purposes, uses and trusts, sufficient to exhaust such income, it shall be the duty of such body or association holding such property to apply to the legislature for authority to expend the income thereof upon such practicable objects as shall most nearly conform to the intent of the uses and trusts upon which such property is held, and in default thereof such income as shall not be so expended in execution of its trusts shall be paid into the treasury of the Commonwealth."

Sect. 9. "All property hereafter acquired and held by persons, corporations or associations forbidden by this act to hold the same, or held contrary to the intent of this act, and all such hereafter acquired and held beyond the limit prescribed as aforesaid by this act, shall escheat to this Commonwealth."

Sect. 15. "All dispositions of property, hereafter made to religious, charitable, literary or scientific uses, and all incorporations or associations formed for such objects, shall be taken to have been made and formed under and in subordination to all the duties and requisitions of this act as rules of property and laws for their government."

The Act of April 17th 1869, entitled "A further supplement

to an act entitled 'An Act to declare and regulate escheats,' passed September 29th 1787," provides—

Sect. 1. Whenever any cestui que trust has heretofore, or shall hereafter, die intestate, without heirs or any known kindred, a widow or surviving husband, the beneficial interest of such cestui que trust in any property or effects, real, personal or mixed, shall escheat to the Commonwealth, subject to all legal demands on the same.

Sect. 2. Whenever any trustee is, or shall be, seised or possessed of any property or effects, real, personal or mixed, the cestui que trust or cestui que trusts whereof have been, or shall be, unknown for the space of seven years, the beneficial interest of the cestui que trust or cestui que trusts therein shall escheat to the Commonwealth, subject to all legal demands on the same.

Sect. 3. Whenever any trustee, bailee or other depositary, is or shall be seised or possessed of property, real, personal or mixed, as a fiduciary agent, which property is or shall be without a rightful owner, the same shall escheat to the Commonwealth, subject to all legal demands on the same.

On the 19th of April 1869, R. W. Jones made information to the auditor-general, that the plaintiff was seised and possessed of certain lands, &c., goods, &c., which "have no rightful owner, and that the same have escheated to the Commonwealth of Pennsylvania; and further, that the said Commonwealth is of right entitled to be seised and possessed of and to have and enjoy the same."

The auditor-general thereupon, on the 1st of May, appointed George S. West, the defendant, deputy escheator, under the Act of September 29th 1787, relating to escheats, and its supplements. On the 24th of July 1869, the deputy escheator issued a precept for an inquest to inquire as to the escheat, &c., to meet on the 6th of August. On the hearing before the escheator, Caleb Cope, the president of the society, testified that the surplus as reported by the auditors was correct nominally, but the *actual* surplus could not be ascertained until the assets should be realized and the institution wound up: the surplus is not distinguishable from the general funds of the society. If the assets were converted gradually and under favorable circumstances, the cash surplus might be equal to the sum reported; but compelled to be converted suddenly or at an unfavorable time, considerable loss would result. From the character of the depositors, most of whom are ignorant and timorous, a saving fund is liable to sudden runs to a large amount, which requires it to realize as rapidly as possible to save insolvency; it is therefore peculiarly necessary for such societies not to divide the whole annual income, but to retain a small percentage to guaranty the capital against loss. Care has been taken that the surplus of this society should not increase beyond what

would constitute a due regard for safety. The society never lends at rates above 6 per cent. and never discounts.

Several other witnesses testified in the same manner. It also appeared that there were depositors who had been unknown for seven years.

The case before the escheator's inquest was closed on the part of the Commonwealth November 29th 1869, and the claim was stated to be

" 1. The amounts standing to the credit of all depositors who have been unknown for seven years past.

" 2. Under the 12th section of the Act of 26th April 1855, the difference between the amount of the surplus fund as it then existed and at the present time, which difference is without a rightful owner."

The bill set out the foregoing facts. The plaintiff also averred that there were but about 50 depositors out of 29,589 who had not been traced; they denied that they were a religious, charitable, literary or scientific society; they averred that if the Act of 1855 applied to their case, the amount of accumulated income could not be ascertained but by a long account and inquiry by a competent accountant, and the informer has presented no facts by which a guess at the amount could be made; that as the very end and purpose of the institution is security to depositors, the surplus could not be paid away or into the state treasury without endangering the security; that the inquest to accomplish its objects must continue for a long time and acquire great publicity and result in great and irreparable injury to the society and the depositors.

They prayed:

1. That the court shall declare the true intent and meaning of the said Act of Assembly of the 17th of April 1869, and the rights of these complainants and of the informer under the same, directly or indirectly, as also of the said Act of the 26th of April 1855.

2. If the court shall declare that, under the circumstances, and the Acts of Assembly hereinbefore referred to, any parts of the property held by the complainants as their assets and property have no rightful owner and are liable to escheat, the court shall then declare what parts are so liable, or on what basis this liability shall be ascertained, and shall thereupon direct inquiry to be made and an account taken with respect to such assets and property, to the end that the proportion or share thereof, if any, which the defendants are liable to pay to the Commonwealth by way of escheat, and the value thereof, may be ascertained; the complainants hereby tendering themselves ready and willing to account, with respect to all matters as to which the informer defendant is entitled to have an account, and to pay the amount so ascertained to be due; and that, in the meantime, the defendant be restrained,

by injunction, from further prosecution of the pending proceeding, or instituting any other proceeding with respect to all claims mentioned in the information and writ, other than the amount due by the complainants to persons who, having been depositors, are dead, without issue or known kindred, husband or wife.

3. General relief.

After hearing, the court (Read, J.), on the 4th of December 1869, granted a special injunction, which is as follows:—

"Whereas, it has been represented, &c., in a certain case therein depending in which the Philadelphia Saving Fund is complainant, and you the said Whittendale Jones and George S. West, are defendants, that upon an information filed, and a certain writ or precept therein issued, you the said defendants are proceeding before a jury of inquest, in the matter of the alleged escheat of certain property real and personal, of which it is alleged that the Philadelphia Saving Fund Society aforesaid, are seised and possessed, and which have no rightful owner.

"Now, therefore, we do strictly enjoin and command you, the said R. Whittendale Jones and George S. West, your servants and agents, and all and every of you, that you do from henceforth altogether absolutely desist from the further prosecution of the said proceeding, in respect of all claims mentioned in the said information and writs, other than the amount due by the Philadelphia Saving Fund Society aforesaid, to persons who having been depositors in the said society, are dead without issue, or known kindred, husband or wife, until our said court shall otherwise make order to the contrary."

West, deputy escheator, appealed to the court in banc.

He assigned for error:

1. The court erred in granting the injunction.

2. The court erred in entertaining the bill.

*J. W. M. Newlin* and *F. C. Brewster*, Attorney-General (with whom was *W. J. McElroy*), for appellant.—A court of equity has no power to enjoin an inquest by the Commonwealth. An injunction will not lie against the state: Hill *v.* United States, 9 How. 386; Mississippi *v.* Johnson, 4 Wall 475; United States *v.* McLemore, 4 How. 286; Marbury *v.* Madison, 1 Cranch 137; Griffith *v.* Cochran, 5 Binn. 87; Commonwealth *v.* Cochran, 6 Id. 456; Commonwealth *v.* Cochran, 1 S. & R. 473; Mott *v.* Penna. Railroad, 6 Casey 33. A court of equity cannot interfere in proceedings purely statutory: Brightly's Eq. § 283; Holl *v.* Holl, 4 Amer. Law J. 424; Eden on Injunction, c. 2, p. 3; Crawford *v.* Commonwealth, 1 Watts 485; Attorney-General *v.* Utica Ins. Co., 2 Johns. Ch. R. 376. Nor where there is an adequate remedy at law: Scheetz's Appeal, 11 Casey 95; Patterson *v.* Lane, Id. 275; Commonwealth *v.* Plankroad Co., Id. 152; Gallagher *v.* Railroad

[West's Appeal.]

Co., 2 Wright 102 ; Pusey *v.* Wright, 7 Casey 396 ; Glenn *v.*
Fowler, 3 Gill & J. 340 ; Hood *v.* New York, 23 Conn. 609 ;
Richardson *v.* Richardson, 8 Gill 448 ; Hunter's Appeal, 4 Wright
194 ; Rogers *v.* Cincinnati, 5 McL. 337 ; Boyd *v.* Miller, 2 P. F.
Smith 431 ; Lord Montague *v.* Dudman, 2 Ves. Sr. 306 ; Crafts
*v.* Dexter, 8 Ala. 767. The Philadelphia Saving Fund Society
is a charitable corporation under the Act of 1855, and the relation
between the society and its depositors is that of trustee and cestui
que trust, and not that of debtor and creditor : Magill *v.* Brown,
Brightly's R. 356 ; Witman *v.* Lex, 17 S. & R. 88 ; Going *v.*
Emery, 16 Pick. 107 ; Zimmerman *v.* Anders, 6 W. & S. 218 ;
Price *v.* Maxwell, 4 Casey 23 ; Pepper's Estate, 1 Pars. R. 436 ;
Girard Will Case 54 ; Jones *v.* Williams, Ambler 651 ; Morice *v.*
Durham, 9 Ves. 405 ; Porter's Case, 1 Rep. 24 ; Babb *v.* Reed,
5 Rawle 151 ; Attorney-General *v.* Heelis, 2 Sim. & St. 67 ;
Thomas *v.* Ellmaker, 1 Pars. R. 98 ; Miller *v.* Porter, 3 P. F.
Smith 292. The society is not entitled to sustain a bill for an
account, as this is not a case of mutual demands, or a series of
mutual transactions, and the society requires no discovery, all the
facts being within their own knowledge : Skinner *v.* Dayton, 3
Johns. Ch. 526 ; McGowin *v.* Remington, 2 Jones 63 ; Shollen-
berger's Appeal, 9 Harris 340 ; Bank U. S. *v.* Biddle, 2 Pars.
53 ; Gloninger *v.* Hazard, 6 Wright 389 ; Brightly's Eq. §§ 124,
125 ; Story's Eq. §§ 458, 459, 462 ; Porter *v.* Spencer, 2 Johns.
Ch. Rep. 171 ; Dinwiddie *v.* Bailey, 6 Verm. 136 ; Eden on
Injunction 23.

*R. C. McMurtrie* and *H. Wharton* (with whom was *W. H.
Rawle*), for the appellees.—The society by rendering gratuitous
services in administering the affairs of others, did not become a
charitable society within the meaning of the Act of 1855 : Bank
of Savings *v.* The Collector, 3 Wall. 495 ; State *v.* Louisiana
Savings Inst., 12 La. ; Amer. R. 570 ; Babb *v.* Reed, *supra ;*
Blenon's Estate, Brightly's R. 338. An escheator's inquisition
could not take the necessary account ; equity has the jurisdiction :
Kerr on Injunctions 58 ; Drewry on Injunctions 74 ; Taff Vale
Railway *v.* Nixon, 1 H. Lds. Cas. 122 ; North Eastern Railroad
*v.* Martin, 2 Phil. 762 ; Foley *v.* Hill, 2 H. & C. 37 ; Bliss *v.*
Smith, 34 Beav. 508 ; Kerr on Injunctions 60 ; Story's Eq. Jur.
§ 459 ; O'Connor *v.* Spaight, 1 Sch. & Lefroy 309 ; Scott *v.*
Corporation, 3 De G. & Jones 35 : McIntosh *v.* Great Western
Railway, 3 Sm. & Giff. 146 ; Padwick *v.* Hurst, 18 Beav. 580 ;
Kennington *v.* Houghton, 2 Y. & Coll. Ch. 627 ; Flukes *v.* Taylor,
3 Drewry 191. Public officers may be restrained : Kerr on In-
junctions 348 ; Felton *v.* Herbert, 30 L. I. Ch. 604 ; Hilliard on
Injunction 374 ; Green *v.* Mumford, 5 Rhode I. 475 ; Miller *v.*
Gorman, 2 Wright 312 ; Ewing *v.* Thompson, 7 Id. 372 ; Mott *v.*

Penna. Railroad, 6 Casey 41; Osborn *v.* U. S. Bank, 9 Wheat. 739; Darby *v.* Wright, 3 Blatchf. C. C. 170.

The opinion of the court was delivered, February 28th 1870, by AGNEW, J.—The claim of the Commonwealth to the surplus fund of Philadelphia Saving Fund Society is clearly unfounded. Neither the Act of 26th April 1855, relating to literary, charitable, and religious societies, nor the Act of 17th April 1869, for the escheat of equitable interests without a rightful owner, applies to this society. It has not the semblance of a charity. It is specifically a business corporation for pecuniary purposes; to receive deposits of money, invest them for the security of the depositors, and repay them with interest. The preamble sets forth, in precise terms, its sole purpose to be that of receiving and investing in public stocks, or substantial security on real estate, the small sums saved from the earnings of tradesmen, mechanics, laborers, servants and others, and of affording to industrious persons the advantages of security and interest.

The charter authorizes the society to receive, take and hold real and personal estate by gift, devise and bequest, as well as by purchase, loan, deposit and advance. But all these modes of acquisition, whether by gift or purchase, are expressly declared to be for the " uses, ends and purposes" of the institution, which are pecuniary, and not charitable in any sense of the term, legal or popular. The words gift, devise, bequest and legacy, denote only additional means given to effectuate the purpose of the charter, and are not indicative of its purpose or design. These terms are used in many old charters to describe modes of acquisition, not ends to be subserved. In this charter they are evidently subsidiary to the power to invest to enable the society to strengthen its securities, by the use of all the various forms of assurance. If a father desire to reinforce the failing or doubtful security of his son, his aid might come in any of these modes.

Power is also given to the society to "improve and augment" its property, evidently for the purpose of creating a fund for increased security against losses and fluctuations in the value of investments. The rents, income and profits of the property are to be applied to the " uses, ends and purposes " of the institution, according to the rules and regulations of the society itself, made or to be made by it as fully and effectually as it could be done by a *natural* person. This is a broad grant of power, vesting the fund to be created under this authority in the corporation itself, not for any particular *cestui que trust*, but for the general uses and purposes of the corporation. It cannot be said, therefore, to be property without an owner. It has not only a lawful owner, but a continuing, valuable and special purpose to subserve. The

14 P. F. SMITH—13

property thus improved and augmented as a safety fund for the protection of depositors, the society is expressly authorized to hold, enjoy and retain to the use, end and purposes of the institution, without any limitation whatever.   Nor is danger to be apprehended from this large grant of powers, the legislature having reserved the power to revoke and annul the corporation. The want of stockholders and prohibition on the corporators or managers to derive emolument from the fund does not rob the society of the express powers thus given.   If there were no beneficial purposes to which the fund was devoted, the argument that it is without an owner might have some force.   But the obvious purpose of producing a fund by improving and augmenting the property of the society is to furnish an adequate security for the repayment of depositors.   The success attending the administration of the investment, in producing the large surplus now existing after nearly half a century of good management, detracts nothing from the charter right to enjoy the accumulation for the true purposes of the society.   Besides the internal evidence afforded by the charter itself, of the business character of the corporation for pecuniary purposes, the general legislation of the state has heretofore classed such institutions with other business associations, such as bank, loan, insurance companies, &c., for various purposes, such as taxation, unclaimed dividends, and deposits.

This being the true character of this society, it is obvious it is not the subject of escheat, and the proceeding to condemn its surplus fund (especially in a mode not prescribed by law) is illegal and injurious.   Let us, then, examine the proceedings.   The ninth section of the Act of 1855 directs the proceeding to escheat property held by a corporation contrary to the true intent of that act, to be by "quo warranto, in all respects as is provided by law in the case of the usurpation of any corporate franchises." Viewing this as a case of charity, the commission of the auditor-general to the deputy escheator is without authority and confers no power to proceed under the Act of 1855.

If the proceedings be considered as under the Act of 1869 to escheat property without a rightful owner, another obstacle presents itself.   The Act of 1869 wholly omits to provide for its enforcement.   If we might supply by intendment the mode of proceeding according to the Act of 1787, because of the title of the Act of 1869, as "a further supplement" to that law, yet the proceeding would be inapt and defective as applied to cases of trust property. Under the Act of 1787, the inquiry is simply whether an intestate has died, seised or possessed, without lawful heir or known kindred.   It is true, it permits a claimant or party in possession to traverse the finding of the inquest, and thus to raise a question of property in a court of law; but the difficulty would be to apply

[West's Appeal.]

this to the varied cases of trust. Can the property be seized and sold or rented by the sheriff, under process directed to him in the mode prescribed by the Act of 1787? This would displace the trustee who holds the legal title, is bound to use it to maintain the purpose of the trust, and whose title and control may have to remain in order to preserve the estate, and to protect ulterior, contingent or alternative interests.

The proceedings under the Act of 1787 would do to determine an ordinary question of property, but judicial intendment would be insufficient—it would require legislative power to adapt it to the peculiarities of a trust. Perhaps nothing short of equity powers would be available to mould the proceedings to suit the exigencies of each particular trust.

The proceeding to escheat the surplus fund being illegal both in its object and its mode, the judge at Nisi Prius was right in enjoining it. The act is contrary to law, and is also prejudicial to the interest of the society and its depositors. No one can doubt that an attempt to wrest from it its surplus fund with the apparent approbation of this court must impair its credit and curtail its business and might subject it to a recall of its deposits, forcing it either to suspend payment or impair its assets by the sacrifices necessary to maintain its solvency. We cannot view the proceedings of the auditor-general and his deputy as that of a sovereign, neither to be resisted nor to be arrested; but by reason of its entire want of authority, we must declare it to be illegal and void of sovereign sanction. Persons thus proceeding illegally do not represent the state, which is presumed to do no wrong, and are, therefore, to be restrained, not because they are acting as agents or officers under its commission, but because they are proceeding in violation of right and contrary to law, and have no legal commission to do the act they are seeking to perform. The process of this court acts upon them as individuals, and not upon the state. The decree of the Court of Nisi Prius is therefore affirmed.