THE SAVINGS BANK OF BALTIMORE, ET AL.
*v.* BANK COMMISSIONER OF THE STATE
OF MARYLAND, ET AL.

[No. 39, September Term, 1967.]

*Decided January 15, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Franklin G. Allen,* with whom were *Charles T. Albert* and
*Decatur H. Miller* on the brief, for appellants.

*Edward L. Blanton, Jr., Assistant Attorney General,* with
whom was *Francis B. Burch, Attorney General,* on the brief,
for Bank Commissioner of the State of Maryland, one of ap-
pellees; *Richard W. Emory,* with whom were *William J. Mc-
Carthy* and *Venable, Baetjer & Howard* on the brief, for The

Equitable Trust Company and Suburban Trust Company, other appellees.

SINGLEY, J., delivered the opinion of the Court.

On 30 January 1819, the Maryland Legislature passed "An Act to incorporate the Savings Bank of Baltimore." [1] The cor-

---

1. 1. BE IT ENACTED, *by the General Assembly of Maryland,* That Isaac Philips [names of other incorporators omitted] and all and every other person or persons hereafter becoming members of the Savings Bank of Baltimore, in the manner hereafter mentioned, shall be and are hereby created and made a corporation and body politic, by the name and style of The Savings Bank of Baltimore, and by that name shall have perpetual succession, and be capable by law to hold property; sue and be sued, plead and be impleaded, answer and defend, and be answered and defended, in courts of law and equity, or in any other place whatever, and to receive and make all deeds, transfers, contracts, covenants, conveyances and grants, whatsoever, and to make, have and use, a common seal, and the same to change and renew at pleasure, and generally to do every other act or thing necessary to carry into effect the provisions of this act, and promote the design of said corporation.

2. AND BE IT ENACTED, That said corporation shall annually, on the first Tuesday in February in the city of Baltimore, or at such other time or place as by the by-laws or regulations hereafter to be adopted, may be appointed, elect from the members of said corporation twenty-five directors, to serve for the term of twelve months, or until others shall be chosen, who during their term of service, shall have the sole management and direction of the concerns of said corporation, elect a president from their own body, and be authorised to make, from time to time, as they may deem expedient, such by-laws, or other rules, for the regulation and government of themselves, and the members of said corporation, and the same to change, add to, or amend, as may appear necessary or proper; *Provided always,* that such by-laws or rules be not contrary to the constitution and laws of the United States, or of the State of Maryland; *And provided also,* that said corporation shall not be authorised to make any bills or notes in the nature or description of bank notes, or to loan any part of the funds deposited to any director of said corporation.

3. AND BE IT ENACTED, That said corporation shall be capable of receiving from any free person or persons, any deposit or deposits of money, and that all monies received, or to be received,

porate purpose appears in Section 3 and the grant of powers, in Section 1 of the charter granted by the Legislature. The sole limitation is contained in Section 2:

*"And provided also,* that said corporation shall not be authorized to make any bills or notes in the nature or description of bank notes, or to loan any part of the funds deposited to any director of said corporation."

From this beginning there evolved The Savings Bank of Baltimore (the "Bank"), a mutual savings bank which at 31 December 1965 had total assets of more than $341,000,000 and deposits of more than $306,000,000.

On 31 December 1957 The Metropolitan Savings Bank of Baltimore ("Metropolitan"), also a mutual savings bank, was merged into the Bank. Metropolitan had been originally incorporated on 22 March 1867 as the "Beneficial Savings Fund Society of Baltimore" by Chapter 237 of the Acts of 1867,[2] and

shall be vested in public stocks, or other securities, and such interest be allowed to the depositors thereof as may from time to time be directed or provided for, by the by-laws of said corporation; the surplus profits to be divided every three years among the depositors, in such manner as the directors for the time being may think proper; and that no member shall be liable in his person or property for any debts, contracts or engagements, of the said corporation, but that the money, property, rights and credits, of said corporation, and nothing more, shall be liable for the same.

4. AND BE IT ENACTED, That the directors of said corporation, or a majority of those attending at any meeting of the board, may elect, by ballot, any other person or persons as members of the Savings Bank of Baltimore.

Chapter XCIII of the Acts of the General Assembly of Maryland of December, 1818 (Volume 6, Kilty, Harris, Watkins, *Laws of Maryland*).

2. AN ACT entitled, an Act to incorporate the Beneficial Savings Fund Society of Baltimore.

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That Frances Neale [names of other incorporators omitted] and their successors, forever be and they are hereby made a body politic and corporate in law, under the name, style and title of the Beneficial Savings Fund Society of Baltimore, and by that name shall have perpetual succession, and shall be able and capable in law to have and use a common seal, to sue and be sued, to plead

Chapter 63 of the Acts of 1876 amended its charter to change the name to Metropolitan without otherwise altering the charter.

Commencing in 1869, Beneficial Savings Fund Society offered checking account facilities to its customers, and at the time of Metropolitan's merger into the Bank, there were 116 such accounts with aggregate balances of $1,917,438. These were continued by the Bank, and although some were closed and some opened, the number remained relatively constant until 1966, when the number of such accounts increased to 644

---

and be impleaded, and to do all such things as are incident to a Corporation.

Sec. 2. *And be it enacted,* That the above named persons shall be Managers of the said Beneficial Savings Fund Society of Baltimore, the said Corporation shall have power from time to time to make by-laws, rules and regulations relative to the election, duties, time of service, and number of Managers and their successors, and the appointment of suitable officers and assistants. The said Managers for the time being shall have power to direct and determine the manner, conditions and terms of receiving deposits, and the return and re-payment of the same, when demanded by the depositors, and the investment of substantial securities of the amount in the custody of the Corporation, and generally to do and execute all and singular such acts, matters and things, which to the said Corporation shall or may appertain, and may be necessary for the purposes thereof, according to the object, provisions and conditions of this Act, the articles and by-laws enacted from time to time by this Corporation, and not being contrary to the Constitution and laws of this State or of the United States; *provided,* that this Act shall not be construed to confer on said Corporation banking privileges of any kind whatever.

Sec. 3. *Be it enacted by the General Assembly* That the said Corporation shall be able and capable in law to purchase, receive, improve and hold such real estate, as to the Managers may seem proper for the purposes of said Corporation, and for the security of the depositors, and the same to grant, bargain, sell, release, mortgage and dispose of, as to them may seem expedient, and to take, receive, hold, possess, enjoy and retain all and all manner of lands, tenements, rents, stocks, annuities, franchises and hereditaments, and any sum or sums of money, and any manner or portion of goods and chattels, and effects of what kind or nature soever, whether real, personal or mixed, by gift, grant, demise, bargain and sale, devise, bequest, testament, legacy, loan, deposit or advance, or by any other mode of conveyance or transfer whatever.

as a result of the Bank's determination to increase checking account services to its depositors.

Certainly since 1932, and possibly since 1910, the reports of the State Bank Commissioner on his examination of Metropolitan, and later of the Bank, reflected the existence of the checking accounts. These were identified in the Commissioner's reports as "Demand Deposits (Checking)" in 1932, 1934-1936; as "Time Deposits (Checking)" in 1936; and as "Demand Deposit—Individual Accounts" from 1937 until 1965.

Late in 1965, the Bank advised the Bank Commissioner of its desire to make checking accounts a service available to all its customers. Its right to do so was questioned by The Equitable Trust Company. The Bank Commissioner sought the advice of the Attorney General, who submitted a formal opinion on 28 March 1966.[3]

---

3. "In your letter of January 19, 1966, you advised us that a savings institution subject to the jurisdiction of your Department has, for some time, serviced a number of checking accounts and has expressed a desire to enlarge the service. You requested our opinion as to the institution's right to provide general checking account services. We are of the opinion that no such right exists, and that the practice is contrary to the banking laws of this State.

I.

Section 41(a) of Article 11 of the Annotated Code of Maryland ordains that '[e]very savings institution * * * transacting *strictly a savings bank business*, shall be capable of receiving from any person or persons, or bodies corporate or politic, any deposit of money, *which shall be invested or loaned out on good security, in the discretion of the directors; * * *'*, and further that the deposits 'may be withdrawn at such time and in such manner as its by-laws may permit, * * *'. The statute does not define the business of a savings bank, but the Supreme Court of Pennsylvania, in *Bulakowski v. Philadelphia Sav. Fund Soc.*, 270 Pa. 538, 113 Atl. 553, stated·

'A savings bank is an institution organized to promote prosperity of persons of small means and limited opportunities, wherein earnings may be gained on aggregate small deposits, which, after deducting necessary expenses and a reserve for depositor's security, are divided among the depositors. There is no capital stock, nor are there stockholders in such institutions, and it is not a bank in the commercial sense of that word. It is not, however, for all purposes, a charitable society and under certain instances,

When the Bank questioned the validity of the position taken by the Attorney General, the appellant, Robert W. Thon, Jr., president of the Bank, was advised that it was the intention of

has been held to be a business corporation. West's Appeal, 64 Pa. 186; Bank for Savings v. Collector, 70 U. S. (3 Wall.) 495, 18 L. Ed. 207. The relation between the institution and the depositor is, in some aspects, that of a trustee and cestui que trust (Barrett v. Bloomfield Savings Institution, 64 N. J. Eq. 425, 433, 54 Atl. 543; State v. People's National Bank, 75 N. H. 27, 29, 70 Atl. 542, 21 Ann. Cas. 1204); * * *'

This definition is in substantial agreement with that contained in Michie's *Banks and Banking* (Vol. 3, 1913), Section 289, viz: 'banks of deposit for the accumulation of small savings belonging to the industrious and thrifty.' In *Bank of Redemption v. Boston*, 8 S. Ct. 772, 125 U. S. 60, 31 L. Ed. 689 (1888), the Supreme Court, in determining the liability of a savings institution for franchise taxes imposed upon 'moneyed capital' emphasized that savings banks were 'organized for the purpose of *investing the savings of small depositors* and not as banking institutions in the commercial sense of that phrase.' While the wisdom of continuing to characterize savings banks as depositaries for the funds of the poor or small depositors may be questioned, we are of the opinion that the essence of the foregoing definitions prevails and it is to these definitions that we must look in order to find the legislative intendment in using such language as 'strictly a savings bank business.'

We conclude, therefore, that the business of a savings bank in this State is strictly limited to receiving deposits of money, which deposits shall be either invested or loaned out (the decision as to such investing or lending being that of the directors) and paying to the depositors, after due allowance for operating expenses, the dividends and interest earned by the investing or lending. Whether the deposits are withdrawn by presentation of a passbook, by an order presented to the bank for payment, or by check is a matter to be determined by the by-laws of the bank. What the statute does require, however, is that the deposits received shall be invested or loaned out by the directors; and what the statute does not permit is the receipt of deposits which are not invested or loaned out, and which are subject to withdrawal by check.

II.

This does not mean, however, that a savings bank cannot acquire the powers of a commercial bank. In 7 *Opinions of the Attorney General* 50, we had occasion to determine whether the Franklin Savings Bank of Frederick was in fact a savings bank, as its name

the Bank Commissioner to take steps under Maryland Code (1957), Art. 11, § 11, *as amended*, (Supp. 1964), to remove Thon from office. The Bank and Thon then instituted proceed-

seemed to indicate, or a commercial bank, a term we use here for convenience to refer to institutions described in §§ 28 through 38, inclusive, of Article 11. At that time the Court of Appeals had already decided that 'the character of a bank or other institution does not depend upon its name or title, but upon the nature of the business conducted by it and the enterprise in which it is engaged.' *State v. German Savings Bank*, 103 Md. 204.

In determining that the Franklin Savings Bank was a commercial bank and not a savings bank, it was noted that the bank had, on June 27, 1881, through its Board of Directors, determined that its weekly savings deposits would thereafter be treated as capital stock and its depositors were given certificates which, to all intents and purposes, became certificates of ownership in a commercial bank rather than deposits in a mutual savings bank. Ownership by stockholders alone, however, was not enough to classify a savings bank as a commercial bank (see 5 *Opinions of the Attorney General* 43), and, after examining the totality of the bank's activities, it was concluded that the bank had 'abandoned its savings bank business and is now conducting a general banking business * * * '. *State v. Central Trust Company*, 106 Md. 269.

It is apparent from a review of the provisions of Article 11 relating to banking institutions that the legislative scheme of regulation is predicated upon the basic difference between mutual savings institutions and banks and trust companies, the latter create credit, the former do not—therefore Section 77 imposes reserve requirements upon the latter and not the former. See also §§ 78 and 90. Banks and trust companies are prohibited from carrying bills payable or rediscounts for longer than 90 days (Section 79), from imposing a service charge on deposits restricted by the bank commissioner (Section 83) and from certifying checks unless the drawer has on deposit a sum of money equal to the amount of the check, draft or order (Section 93). A series of other specific sections relating to capital, surplus and stockholders obviously apply only to banks and trust companies, but we think it is significant that the legislature, when such sections may apply to savings banks having capital stock, specifically included language to that effect. See Section 81.

Of greater significance to the question presently before us is that many of these sections, restricting the activities of banks and trust companies, relate to checking accounts, abuses that are associated with checking accounts, and the creation of credit. When these sections are considered, together with the fact that the cre-

ings in the Circuit Court of Baltimore City for declaratory re-
lief and to enjoin the action contemplated by the Bank Com-
missioner. The appellees, The Equitable Trust Company

ation of credit through checking accounts is a basic technique of
modern banking, we are not inclined to conclude that the legis-
lature would exclude savings banks from the restrictions imposed
upon banks and trust companies if savings banks had the right,
under Article 11, to such checking services through the expedient
of amending their by-laws and without any further legislative
sanction, or, at the very least, an amendment of the charter to
convert the savings bank to a bank or trust company and there-
fore automatically subject it to the restrictions imposed by Article
11.

This result is compelled by precedent. In *State v. German Savings
Bank*, supra, the Court of Appeals was called upon to decide, *inter
alia*, whether or not the German Savings Bank was authorized to
carry on a general banking business. The bank was incorporated
under the general laws of Maryland authorizing the formation of
savings institutions for the purpose of conducting a savings bank
on April 11, 1895. To authorize it to carry on a general banking
business, it was necessary to enact Chapter 266, Laws of Maryland,
1898, to 'amend the charter of the bank' and to 'authorize such
bank to engage in and conduct a general banking business.' Thus,
it appears that a bank chartered to conduct a savings bank business
is limited to 'strictly a savings bank business' unless it amends its
charter to obtain the authority needed to conduct a general bank-
ing business. In so doing, it subjects itself to the appropriate pro-
visions of Article 11 regulating the conduct of commercial banks,
and the legislative scheme of dividing banking institutions into
various categories, dependent upon the nature of the business being
done, and imposing requirements on each category deemed neces-
sary to protect the public interest, is not frustrated.

III.

We have given careful consideration to the opinion of the Su-
preme Court of New Jersey in *Hudson County National Bank v.
Provident Institution for Savings, et al.*, 44 N. J. 282, 208 A. 2d 409,
decided March 22, 1965. The issue there was whether a savings
bank in New Jersey could accept deposits subject to withdrawal by
check. The existence of checking accounts in New Jersey Savings
Banks was upheld. The New Jersey statute, however, permitted
withdrawal of funds 'according to the usual custom of savings
banks'. The statute was enacted in 1948, and at that time a 'number
of savings banks had checking accounts * * *'. The Court autho-
rized the continuation of the practice in New Jersey, not so much

("Equitable") and Suburban Trust Company ("Suburban") relying on Maryland Rule 208 a [4] sought and received leave to intervene in the case; filed an answer; and actively participated in the trial of the case below. From the decree denying the relief prayed and dismissing the bill of complaint, the Bank and Thon appealed. While the Chancellor's declaration was quite brief, the bill should not have been dismissed. This Court has said time and again that seldom, if ever, should a bill or petition in a declaratory judgment proceeding be dismissed without a declaration of the rights of the parties. See *Myers v. Chief of Fire Bureau*, 237 Md. 583, 207 A. 2d 467 (1965).

The principal question raised by the appeal is whether the Bank is prohibited, by the provisions of its charter or by existing law, from permitting its depositors to make withdrawals by check. Under our view of the case, a subsidiary question,

---

because it was the usual custom of savings banks everywhere to have checking accounts, but because the phrase was so indecisive as to indicate an intent not to forbid the practice.

Section 41(a) of Article 11, on the other hand, is far from indecisive. It plainly states that savings banks must conduct 'strictly a savings bank business' and continues to impose the requirement that the deposits of money received by the savings bank 'shall be invested or loaned out on good security * * *'. The statute does not say that such banks may receive deposits solely for the purpose of permitting the depositor to issue orders and drafts upon the bank for checking purposes.

IV.

We are of the opinion, therefore, that savings banks in Maryland have no authority to receive deposits which are not invested or loaned out and which are subject to withdrawal by draft or check. This does not mean, however, that deposits received by savings banks which are received for the purpose of investment or lending out may not be subject to withdrawal by check for the convenience of the depositor. What the law forbids, in our opinion, is the depositing of funds in checking accounts *per se* in saving institutions."

4. Rule 208 INTERVENTION a *Of Right* Upon timely application a person shall be permitted to intervene in an action: (a) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; * * *

relating to the right of Equitable and Suburban to intervene, need not be determined by us.

In support of their contention that the decision of the lower court was in error, the appellants contend that neither the charter of the Bank nor any statutory provision is violated when depositors were permitted to make withdrawals by check.

They cite Maryland Code (1957), Art. 11, § 41 (a), *as amended,* (Supp. 1964) :

"(a) *Receipt, investment and withdrawal of funds.* —Every Savings institution existing under the laws of the State of Maryland, or which may hereafter be incorporated, transacting strictly a savings bank business, shall be capable of receiving from any person or persons, or bodies corporate or politic, any deposit of money, which shall be invested or loaned out on good security, in the discretion of the directors; provided, no part of the funds of such corporation shall be loaned to any officer, director or employee thereof. *The deposits in any savings institution may be withdrawn at such time and in such manner as its bylaws may permit, but such institution may at any time require a depositor to give a notice, not exceeding ninety days, of his intention to withdraw the whole or any part of his deposit.* (Emphasis added)

which should be read in conjunction with Article VIII of the by-laws of the Bank, apparently adopted on 10 November 1965 :

"ARTICLE VIII—SPECIAL PURPOSE ACCOUNTS

Section 1. In addition to the provision for savings accounts, as set forth in Article VII, accounts may be opened for Special Purpose Savings of the type known as Christmas Savings Accounts, Term Savings Accounts, and by other designations; and for Checking Accounts on which the depositor shall have the privilege of drawing by checks payable to the depositor himself or to the order of any other person, firm or corporation.

Section 2. Such deposits shall be accepted by the bank in such amounts and upon such terms and condi-

tions as the President may from time to time fix and determine, subject, however, to these by-laws and to such rules and regulations as the Board of Directors may from time to time enact.

Section 3. Checking Accounts shall be accepted subject to the following conditions:

(1) Deposits in Checking Accounts may be withdrawn at any time except as stated below:

(2) The bank may, by a resolution of its Board of Directors posted in the main lobby of the bank and in each branch office, require depositors of such accounts to give 30 days' notice in writing of any intended withdrawal from such accounts. After the posting of such Resolution and as long as the same remains in effect, the bank may require such period of notice before any withdrawal; except that any check shall be paid when presented if before the posting of such Resolution such check had been drawn and transferred by the depositor to a person, firm or corporation other than the depositor himself and if said check would have been legally payable if said Resolution had not been posted.

(3) The Bank may give notice to any depositor requiring such depositor to withdraw the entire amount in any checking account of such depositor. Such notice shall also advise such depositor that the bank reserves the right after a date specified in said notice not to make payment of any check drawn on such account; and after the date so specified, the bank shall not be obliged to make any payment from such account, except for the purpose of closing such account.

Section 4. Checking accounts shall not be entitled to be credited with interest payments."

The appellants then point out that the only limitation contained in the charter of the Bank appears in Section 2:

"Provided always, that such by-laws or rules be not contrary to the constitution and laws of the United States, or of the state of Maryland; And provided al-

so, that said corporation shall not be authorised to make any bills or notes in the nature or description of bank notes, or to loan any part of the funds deposited to any director of said corporation." [5]

At the trial of the case below, the appellants were able to show that six mutual savings banks in Baltimore, including Metropolitan, prior to its merger into the Bank, had permitted depositors to make withdrawals by check or to maintain checkings accounts; that the existence of such accounts had been known to the Bank Commissioner since 1910, had been the subject of comments by him, but had not been prohibited; and that in the year 1965, immediately preceding the threat of action by the Commissioner, the Bank had issued 73,000 treasurer's checks to depositors making withdrawals and sold 247,000 money orders.

The appellants argue, and we think correctly, that this provides ample support for their contention that there is a demand for the service which they propose to provide. It is interesting to note that no one seems to regard this activity as a violation of the charter prohibition "to make any bills or notes in the nature or description of bank notes" and we agree that the prohibition cannot be regarded as an indication of legislative intent, but must be viewed in its proper historical context: *i.e.,* the fact that state banks customarily issued bank notes until about 1866, and the commitment made by the Maryland Legislature in 1813 (Acts of 1813, Chapter 122) "not to grant a charter of incorporation to any other banking institution to be established in the city of Baltimore before the first day of January eighteen hundred and thirty-five and the end of the session of the General Assembly next thereafter." This act was construed in *Duncan v. The Maryland Savings Institution,* 10 G.

---

5. It should be pointed out that Section 2 of the charter of Metropolitan, printed in full in footnote 2, vested in its managers the "power to direct and determine the manner, conditions and terms of receiving deposits, and the return and repayment of the same" but contained the proviso: "that this Act shall not be construed to confer on said Corporation banking privileges of any kind whatever." However, the proviso should be read in conjunction with *Duncan v. The Maryland Savings Institution,* 10 G. & J. 299 (1838).

& J. 299, 309-10 (1838) as meaning that "no charter of incorporation should be granted to any banking institution to be established within the city or precincts of Baltimore, clothed with the valuable and important power of issuing negotiable notes."

The appellees have mounted a two-pronged attack on the position taken by the Bank. First, they argue a lack of statutory authority, emphasizing the distinction drawn between mutual savings banks on the one hand, and banks and trust companies on the other, in the regulatory pattern and distinguish *Hudson County National Bank v. The Provident Institution for Savings in New Jersey,* 80 N. J. Super. 339, 193 A. 2d 697, aff'd per curiam 44 N. J. 282, 208 A. 2d 409 (1965), relied upon by the appellants, on the ground that the provisions of the New Jersey statute are not controlling; and second, they urge on the court the doctrinaire classification of banks of deposit, of discount and of circulation recognized in *State v. German Savings Bank,* 103 Md. 196, 63 A. 481 (1906).

The expert witness produced by the appellees, Professor Walter A. Morton of the University of Wisconsin, whose field of specialization is money and banking, traced the history of banking from the sixteenth century goldsmiths to the present day. He drew the distinction between the savings banks established in the early nineteenth century and the banks of issue of that day; at least inferentially indicated that the discount, deposit and issue concept was outworn; pointed out that with the establishment of the national banking system in 1865, the power to issue bank notes was effectively restricted to national banks and denied to state banks, and that state banks thereafter prospered because of the increased use of checks as a medium of exchange.

The principal thrust of Professor Morton's testimony, however, was that the basic distinction between a commercial bank and a savings bank is the commercial bank's ability to create money through the extension of credit. In simple terms, this means that the demand deposits of a commercial bank, being part of the nation's money supply, can be made available to a borrower by a bookkeeping entry, and may, in fact, never leave the bank. Time deposits of a savings bank are, theoretically at least, fully invested; not immediately spendable; and not regarded by economists as part of the money supply.

Without presuming to substitute our views for the expertise of a recognized authority, practical considerations cannot be overlooked. We fail to find in the bank's charter or in the applicable statutes the expression of legislative intent or the denial of authority urged on us by the appellees. Moreover, the circumstance that mutual savings banks have permitted withdrawals by check since 1869, and since 1910 with the knowledge and at least tacit consent of the Bank Commissioner, is not lightly to be swept aside.

If, as would seem to be conceded, a depositor of the Bank, on making a withdrawal, has the option of requesting cash, or a treasurer's check, or of purchasing a money order, it seems abundantly clear to us that according him a fourth option of drawing a check on his own account, whether or not he presents his passbook, is a distinction without a difference.

From the standpoint of theory only, it seems to us that Professor Morton failed to give proper weight to two aspects of the problem: first, to Mr. Thon's testimony that it had never been the practice of the Bank to credit the proceeds of a borrowing made by a depositor to the depositor's account, which would negate the conclusion that money was being created by the extension of credit. Second, Article VIII of the by-laws of the Bank subjected accounts subject to withdrawal by check to the same 30 day notice of withdrawal limitation which was theretofore applicable to savings accounts, as sanctioned by Maryland Code (1957), Art. 11, § 41 (a), *as amended,* (Supp. 1964), and this limitation was incorporated in the agreement printed on the signature cards. To us, this negates the assumption that deposits made in accounts subject to withdrawal by check can be characterized as demand deposits. *Cf.* Maryland Code (1957), Art. 11, § 82.

Assuming that the two limitations described in the immediately preceding paragraph are maintained, it is our opinion that the Attorney General was correct in his final conclusion that the Bank could receive deposits subject to withdrawal by checks signed by the depositor, provided that funds so received are invested by the Bank. We cannot agree with the conclusion of the Chancellor that it was unlawful for the Bank to accept and maintain deposits subject to withdrawal by check.

It follows that the court below was in error in entering a decree denying the relief prayed.

> *Reversed and remanded for the entry of a declaratory decree in conformity with this opinion; costs to be paid by appellees, the Equitable Trust Company and Suburban Trust Company.*