FIRST BANCORPORATION, a bank holding company, Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.

Bankamerica Corporation and Wells Fargo and Company, Amici Curiae.

No. 82–1401.

United States Court of Appeals, Tenth Circuit.

Feb. 21, 1984.

John D. Hawke, Jr. of Arnold & Porter, Washington, D.C. (Leonard H. Becker, John A. Kronstadt, Douglas L. Wald and William J. Sweet, Jr., of Arnold & Porter, Washington, D.C., Kent B. Linebaugh and William G. Marsden of Jardine, Linebaugh, Brown & Dunn, Salt Lake City, Utah, with him on brief), for petitioner.

Richard M. Ashton, Asst. Gen. Counsel, Bd. of Governors of the Federal Reserve System, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Michael Bradfield, Gen. Counsel, and Anthony S. Winer, Atty. Bd. of Governors of the Federal Reserve System, Washington, D.C., with him on brief), for respondent.

H. Helmut Loring, San Francisco, Cal., on brief for amicus curiae BankAmerica Corp.

Michael M. Moore of Brobeck, Phleger & Harrison, San Francisco, Cal., on brief for amicus curiae Wells Fargo and Co.

Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and CHILSON, District Judge *.

SETH, Chief Judge.

The petitioner, First Bancorporation, seeks a review of two decisions of the Board of Governors of the Federal Reserve System. By these orders the Board conditionally authorized the petitioner to acquire the Beehive Financial Corporation and directed the petitioner to comply with similar conditions with respect to a previously acquired subsidiary, the Foothill Thrift & Loan Company. Both Beehive and Foothill are industrial loan companies subject to Utah law.

The petitioner is a bank holding company organized under the laws of Utah. The Bank Holding Company Act provides that a bank holding company may not acquire a nonbank unless the company to be acquired is "so closely related to banking . . . as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8). The Board's Regulation Y provides that industrial loan companies are among those activities that are proper incidents to banking. 12 C.F.R. § 225.4(a)(2).

In 1979, the petitioner applied to the Board to operate an industrial loan company, Foothill Thrift & Loan. The Board unconditionally approved the application. In 1981, Foothill began offering negotiable order of withdrawal (NOW) accounts. NOW accounts are interest-bearing accounts from which the account holder may withdraw funds by a negotiable order. Foothill's NOW accounts are offered pursuant to a Utah regulation requiring that Foothill, as an industrial loan company, must reserve the right to require thirty days' notice from the account holder before making a withdrawal. Utah Dept. of Financial Institutions Regulation No. 2, Rec. Vol. I, at 162.

In August 1981, the petitioner applied to the Board to acquire Beehive Financial Corporation, another Utah industrial loan company. The petitioner intended to offer NOW accounts through Beehive.

The Board conditionally approved the petitioner's acquisition of Beehive subject to two conditions. The Board's initial condition was that Beehive not offer both NOW accounts and make commercial loans. The Board's theory in imposing that condition was that if Beehive were to do both, it would be a bank rather than an industrial loan company under the Act, and would thus not be eligible for acquisition as a nonbank entity under section 4 of the Act. The Board's second condition was that if Beehive should elect to forego commercial lending and offer NOW accounts, it had to agree to subject the NOW accounts to Board regulations as to reserves and interest limitations.

Along with its letter to petitioner conditionally approving the Beehive acquisition, the Board ordered that the petitioner's industrial loan company, Foothill, should now also conform to the conditions announced as to Beehive. The Board forwarded copies of the Beehive order to other bank holding companies suggesting that the Board had adopted the Beehive decision as its policy.

The petitioner sought review of both the Beehive and Foothill orders in this court. Beehive has subsequently been acquired by an unrelated company since the filing of the petition for review; however, there remains a controversy as to the Board's Foothill order.

The Board, as mentioned, directed Foothill to choose between offering NOW accounts and making commercial loans. Foothill provided both services. The Board argues that unless Foothill elected to perform only one such function it will be considered a "bank" under the Act.

The petitioner contends that Foothill cannot be considered a bank under the Act because it does not meet the Act's definition of a bank. Section 2(c) of the Act defines a bank as an institution "which (1) accepts deposits that the depositor has a

---

* Honorable Hatfield Chilson, United States District Judge for the District of Colorado, sitting by designation.

*legal right* to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C. § 1841(c) (emphasis added). The petitioner argues that its NOW accounts are not deposits that the depositor has a *legal right* to withdraw on demand. Utah law, it asserts, requires that an industrial loan company must reserve the legal right to require thirty days' notice before it makes payment. There being no legal right to withdraw on demand the petitioner asserts that Foothill cannot be considered a bank.

The Board determined that NOW accounts were demand deposits within the meaning of the Act. It concluded that by accepting such deposits and by offering commercial loans, Foothill was a bank under the Act.

■ We need look no further than the Act's definition of a "bank" to resolve this dispute. As the Supreme Court has announced, "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Associations,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345. As mentioned, section 2(c) of the Act defines "bank" as an institution which makes commercial loans and "accepts deposits that the depositor has a *legal right* to withdraw on demand." 12 U.S.C. § 1841(c) (emphasis added). Utah law specifically proscribes industrial loan companies from accepting demand deposits, requiring instead that the companies reserve the legal right to demand notice prior to withdrawal. There is therefore no legal right of withdrawal on demand. *Accord, Pennsylvania Bankers Ass'n v. Secretary of Banking,* 481 Pa. 332, 392 A.2d 1319; *Savings Bank of Baltimore v. Bank Commissioner,* 248 Md. 461, 237 A.2d 45.

The Third Circuit's opinion in *Wilshire Oil Co. v. Board of Governors of the Federal Reserve System,* 668 F.2d 732 (3d Cir.), is distinguishable. There, a bank holding company which owned a commercial bank sought to evade the Board's jurisdiction by advising the bank's checking account customers that the bank would henceforth reserve the right to require fourteen days' notice prior to withdrawal. The Board concluded that the holding company's action had not abrogated the depositor's legal right to withdraw on demand and that therefore the bank was still under the Board's jurisdiction. The Third Circuit affirmed, declaring that the Board had statutory authority to prevent evasions of the Act pursuant to section 5(b), 12 U.S.C. § 1844(b). The record here evinces no evidence that Foothill has attempted to evade the Act's provisions. The *Wilshire* court " 'penetrat[ed] the form of the contracts to the underlying substance of the transaction.' " 668 F.2d at 740. No such piercing is possible here as the NOW accounts differ legally as well as in form from demand deposits. The substantive differences include that NOW accounts bear interest, are unavailable to certain depositors, and cannot be subject to a legal right of withdrawal on demand under Utah law.

The Board also argues that we should not literally interpret the statutory language but should look to the Board's "long-standing" interpretation of the scope of its authority and to the legislative intent behind section 2(c).

When section 2(c) was initially enacted in 1956, a bank was defined as "any national banking association, or any State bank, savings bank, or trust company." Act of May 9, 1956, ch. 240, § 2(c), 70 Stat. 133. The Board issued two interpretations of the 1956 legislation as including those institutions which accepted deposits subject to check (demand deposits) as well as those which accepted funds from the public that were, in actual practice, repaid on demand. 49 Fed.Res.Bull. 166 (1963); 51 Fed.Res. Bull. 1539–40 (1965). The record here supports the Board's contention that withdrawals from NOW accounts are in actual practice permitted on demand. In 1966, after the Board's two interpretations had been issued, Congress amended § 2(c) to include the "legal right to withdraw" provision. Act of July 1, 1966, Pub.L. No. 89–485, 80 Stat. 236. Congress rejected the Board's

suggested amendment which would have read merely "payable on demand." Congress therefore overturned the Board's interpretation by substituting the *"legal right to withdraw"* language for the Board's right to withdraw on demand *in actual practice* provision. That differentiation, in the words of the Senate Banking Committee chairman, "clearly excludes industrial banks." 112 Cong.Rec. 12386. No room exists for an argument that a practice as to NOW accounts should prevail rather than the statute. The 1980 deregulation act, Pub.L. 96–221, has no impact on this issue.

The Board further ordered that if Foothill should continue to offer NOW accounts, it should subject those accounts to the interest-rate ceilings and reserve requirements prescribed by the Board in Regulations D and Q. 12 C.F.R. §§ 204, 217. The Board purports to assert this authority under the public benefits provision of section 4(c)(8), 12 U.S.C. § 1843(c)(8). Section 4(c)(8) is one of the exceptions to the general rule that a bank holding company may not own or control a nonbank. It provides that if the Board determines that the entity to be acquired is a proper incident of banking and that the proposed activity "can reasonably be expected to produce benefits to the public" then the acquisition shall be approved. In determining whether public benefits will accrue, the Board is to weigh the benefits "such as greater convenience, increased competition, or gains in efficiency" against "possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices."

The Board has adopted a commonly accepted two-step process for reviewing section 4(c)(8) applications. *See Connecticut Bankers Ass'n v. Board of Governors of the Federal Reserve System,* 627 F.2d 245, 249–50 (D.C.Cir.). First, the Board determines whether the type of activity proposed is closely related and incidental to banking. This is accomplished by reference to the Board's Regulation Y which lists permissible banking-related activities. 12 C.F.R. § 225. Regulation Y was promulgated under the Board's rulemaking authority.

Second, the Board determines on a case by case basis whether the public benefits of the specific activity proposed in the application outweigh the potential adverse effects. *Connecticut Bankers Ass'n v. Board of Governors of the Federal Reserve System, supra.*

The Board argues that we must give deference to its § 4(c)(8) determinations and affirm the Board's factual findings if they are supported by substantial evidence. 12 U.S.C. § 1848.

The discretionary balancing that comprises the second part of the review is not at issue here. The petitioner asserts that the Foothill order is a rule of general applicability subject to the rulemaking provisions of § 553 of the Administrative Procedure Act, and is not, as the Board claims, merely an adjudication of the activity's merits.

The distinction between legislative and adjudicative facts is often subtle or blurred. Administrative agencies are not "precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134. *See also Securities Comm'n v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. However, like all grants of discretion, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion. . . . " *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S., at 294, 94 S.Ct., at 1771.

It is not useful here to delve too deeply into the theoretical distinctions separating administrative and legislative facts. Rather, it is preferable to see how the Board has utilized the Beehive and Foothill orders *post hoc.* On at least three occasions, the Board has instructed other bank holding companies that its policy towards NOW accounts was determined in its Beehive order. *See* Petitioner's Appellate Brief, Appendix B. The Board's order was thus merely a vehicle by which a general policy would be changed. *See* 5 U.S.C. § 551(4).

■ That the Board's order is an attempt to construct policy by adjudication is evident. The Board examined no specific facts as to the potential adverse effects of unregulated Foothill NOW accounts. The Board instead made broad conclusions that "unless the NOW accounts offered by Beehive Thrift are subject to interest rate limitations and reserve requirements . . . [it] is likely . . . [that] the important public policy objectives of the Depository Institutions Deregulation and Monetary Control Act . . . [will be undermined]." Rec.Vol. I, at 259. This is a broad policy announcement. The Board made no conclusions at all with respect to Foothill. Thus, the Board's order contains no adjudicative facts having any particularized relevance to the petitioner. We must conclude that the Board abused its discretion by improperly attempting to propose legislative policy by an adjudicative order. *See N.L.R.B. v. Wyman-Gordon Co.,* 394 U.S. 759, 764–65, 89 S.Ct. 1426, 1428–29, 22 L.Ed.2d 709; *Ford Motor Co. v. F.T.C.,* 673 F.2d 1008 (9th Cir.); *Patel v. Immigration and Naturalization Service,* 638 F.2d 1199 (9th Cir.); *United States v. Empey,* 406 F.2d 157, 170 (10th Cir.).

Implicit in our holding is a rejection of the Board's contention that this is an interpretative rule and therefore exempt from the rulemaking provisions of the Administrative Procedure Act. 5 U.S.C. § 553(b)(A), (d)(2). An interpretative rule "is merely a clarification or explanation of an existing statute or rule." *Guardian Federal Savings and Loan v. Federal Savings and Loan Insurance Corp.,* 589 F.2d 658, 664 (D.C.Cir.). Here, a significant policy change was announced and thus a substantive rule subject to the rulemaking provisions of § 553 was proposed.

We are aware that the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, may subject Foothill to federally imposed reserve requirements. However, the parties have informed us that the F.D.I.C. has not yet so ruled. Consequently, the reserve requirement issue is not moot. We expressly note that we do not here proffer any opinion as to the validity of the regulation of industrial loan compa-nies under the Garn-St. Germain Act or under the Monetary Control Act, 12 U.S.C. § 461.

The orders and decisions of the Board here reviewed are set aside.

IT IS SO ORDERED.